**HARNISCHFEGER CORP. v. NATION-
AL LABOR RELATIONS
BOARD.
No. 10843.**

United States Court of Appeals
Seventh Circuit.
Oct. 26, 1953.

Victor M. Harding, Milwaukee, Wis., for petitioner.

David P. Findling, Associate General Counsel, A. Norman Somers, Asst. Gen. Counsel, Bernard Dunau, George J. Bott, General Counsel, Washington, D. C., Lewis C. Green, Washington, D. C., Attorneys, National Labor Relations Board, for respondent.

Before FINNEGAN, LINDLEY and SWAIM, Circuit Judges.

FINNEGAN, Circuit Judge.

This is a petition by Harnischfeger Corporation, hereinafter referred to as the Company, to review and set aside an order of the National Labor Relations Board, entered on February 27, 1953. In its answer the National Labor Relations Board prayed for the enforcement of its order.

Since the Company is a Wisconsin Corporation, having its principal place of business in Milwaukee within the Seventh Judicial Circuit, this court has jurisdiction pursuant to sections 10 (e) and (f) of the National Labor Relations Act. 29 U.S.C.A. § 160(e, f).

On a charge filed by Amalgamated Local 632, U. A. W.–C. I. O., on September 20, 1951, supplemented by an amended charge on March 10, 1952, the General Counsel of the National Labor Relations Board, on June 17, 1952, issued his complaint against the Harnischfeger Corporation.

As amended at the hearing before the Trial Examiner, the complaint alleged that the respondent Company, on or about September 14, 1951, did lay off and discharge and afterwards did refuse to reinstate three employees because

they had joined, assisted and supported the Union and for the further reason that they had engaged in concerted activities with other employees for the purpose of collective bargaining and other mutual aid and protection. The Company's answer admitted the discharge of the men, but denied the commission of any unfair labor practices. The answer alleged that the three men were discharged because they participated in a work stoppage during working hours in violation of the instructions and directions of the officers of their Union, and in violation of the Company's rules and regulations. The answer also alleged that the stoppage violated a contract then in effect between the respondent company and the Union.

The trial examiner reported that the Company had engaged and was engaging in unfair labor practices within the meaning of sections 8(a)(2) and (3) of the Act, 29 U.S.C.A. § 158(a)(2, 3), and recommended that it be ordered to cease and desist therefrom. The respondent company filed exceptions to the intermediate report and requested oral argument. The Board denied the request for oral argument and overruled the exceptions. It adopted the finding, conclusion and recommendation of the Trial Examiner. The Board ordered the Company to cease and desist from the unfair labor practices, alleged and found by the Examiner, or from interfering in any other manner, with its employees, in the exercise of their rights guaranteed by section 7 of the Act, 29 U.S.C.A. § 157. The Company was also ordered to reinstate three employees, Connelly, Ohlen, and Wheatley, with back pay, and to post appropriate notices.

The record discloses that the Company, which is engaged mainly in the manufacture of construction machinery, over-head cranes, welding equipment, welding rods, prefabricated houses and Diesel engines, maintains two plants at Escanaba, Michigan, located about a mile and a half apart, one being referred to as the truck-crane plant, and the other as the welder plant. At the time of the oc-

currences involved in this proceeding, the Company had about 425 employees, 275 in the truck-crane plant and 150 in the welder plant. The Union, Local 632 U. A. W.–C. I. O., was the certified bargaining agent of the employees, and it or its predecessor locals had represented them since the plants first began operating.

Early in 1951, the Union and the Company had begun collective bargaining meetings to negotiate the terms of a new contract to take the place of an existing contract which by its terms was to expire on May 15, 1951. Agreement had been reached on practically all issues except wages which issue was apparently complicated by the regulations of the War Stabilization Board. Relations between the Union and the Company seemed to be cordial; they met on September 12, 1951, and arranged for another meeting a few days later.

The Company, it appears, allowed their employees a mid-morning break during each working day, lasting for ten minutes from 9:25 to 9:35 A.M. On the morning of Thursday, September 13, 1951, a group of employees in the truck-crane plant met at a time clock on the Company's premises. The apparent purpose of the meeting was to find out from their Union bargaining agent what was going on at their sessions with the Company. As one of them expressed it, they were going "to put a little heat on the Committee and see what they were going to do."

The president of the Union had heard of the proposed meeting only a few minutes before 9:25 A.M. He appeared at the place of meeting and tried to explain to the group there assembled how the bargaining negotiations were proceeding. When the rest period ended at 9:35, the employees took their belongings and punched out on the time clock and proceeded across the road from the Company's property to continue their meeting. The time clock records show that the men whose discharges form the basis of complaint punched out at 9:31. More than 200 of the workers employed

at the truck-crane plant checked out at 9:37, or later.

At this time Company vice-president Menck and general manager Timms drove up to the plant. They had been at the welder plant when the walkout began and a call had been put through to them by the superintendent at the truck-crane plant.

A group of the employees, headed by union president Larson, then left the meeting in the field and came into the plant to talk to Menck and Timms. On being asked by Menck whether the walk out was a union-called strike, Larson replied that the Union had not called it but had tried to stop it. Larson suggested that Menck come over and talk to the group of employees in the field and get the men back to work but Menck refused. Larson then returned to the group in the field and tried once more to persuade the men to return to work. Larson found he had difficulty making himself understood in the open field, and saw that the group would not return to work. He therefore suggested adjourning to a meeting in a hall downtown, where he could explain what had already been accomplished in the negotiations with the Company, and said that the parties had almost reached final agreement on all issues.

The group in the field then left for the Union hall downtown, and the Union officers then called the employees from the welder plant to join the group in the hall downtown. The Company gave permission to the welder plant employees to leave work to attend this meeting. Apparently the 100 employees on the night shift were notified at their homes and also attended the meeting downtown, because the entire membership was at the downtown meeting.

At the meeting held at the hall of the entire membership, the Union president was able to satisfy the employees of the progress being made in collective bargaining, and it was decided to go back to work the following morning. A strike vote was taken to authorize the Union officers to call a strike should they deem it necessary, but this authority was never exercised, and no strike was ever called by the Union.

Following this meeting and on the afternoon of the same day, the Union officers were asked if the Union had authorized the walk out. They protested that they had not authorized it, but had tried to prevent it. They did indicate to the Company, however, that impetus for the walk out came from certain individuals who were dissatisfied with the way the Union officers were handling the negotiations.

After the Union committee left, the Company called in the foremen to find out who the individuals were who had caused the walk out. On the basis of what it learned from the foremen, and from what Management already knew of former activity by certain individuals, it was decided to discharge three employees for "leading an illegal walk out."

One of the dischargees, Wheatley, had led the only previous walk out, which had occurred at the plant without warning and which had lasted only an hour. Wheatley had then been warned that there should be no recurrence. Another of the dischargees, Connelly, about three days before September 13th, had told one of the foremen that there would be a walk out. Connelly and Ohlen had frequently been reprimanded by their foreman for engaging during working hours in arguments with Union officers over the conduct of Union matters.

When the working force returned to work on the morning of Friday, September 14th, the employees named were given discharge slips, and told the reason for discharge. None of them claimed he was innocent or denied instigating the walk out. Ohlen and Connelly, on being told of their discharge, went back into the plant and Ohlen called out to the employees at work, "Come on, boys we're fired." This precipitated another state of confusion, and Union vice-president Honeywell called for a show of hands as to whether they should walk out. After a show of hands

the truck-crane plant employees left the plant.

The employees all came back to work the following work day, Monday, September 17th, with no further communication between the Company and the Union.

After two more bargaining meetings, the parties reached agreement on all points and a new contract was signed which contained a no-strike provision, effective from and after September 1, 1951, to cover the period of time of these events.

Each of the dischargees wrote a letter to the Union asking that a grievance be filed on their discharge, however, no grievance was ever presented by the Union as to this matter.

Out of about 425 employees in the bargaining unit, not more than 100 gathered at the time clock. None of the witnesses who testified to this incident placed the number at the time clock at more than 100. There were another 150 employees at the welder plant, one and one-half miles away, who took no part in either the gathering at the time clock or in the field across the road from the truck-crane plant. There were also the 100 truck-crane plant employees on the night shift who took no part in the walk out, but who apparently came to the downtown meeting and voted to call off the walk out. There were also several employees on the day shift in other parts of the truck-crane plant who did not know what was going on.

Nevertheless, the trial examiner labored under the illusion that the entire bargaining unit chose to walk out. In this he was mistaken.

The trial examiner concluded that the walk out was "to exert collective pressure upon the respondent to obtain a wage increase," and "a demand for increased wages and the settlement of negotiations for a new contract."

There is absolutely nothing in the record to support these conclusions of the trial examiner.

The record is barren of any evidence that the walk out was to enforce any demands by the membership, or that it was designed to exert pressure on the Company or to force correction of some grievances. At neither the morning nor afternoon meetings of September 13th between the Union officers and the Company was there any mention made of union demands or of any employee grievance or protest. As a matter of fact, one of the discharged employees stated that the object of the assembly at the time clock was to put "heat on the bargaining committee" of the Union.

The vital question presented is: Was the work stoppage and walk out on September 13, under the facts and circumstances disclosed by this record, such a concerted activity for mutual aid and protection by employees so as to be within the protection of section 7 of the Labor Management Relations Act? The petitioning Company claims that it was not.

Section 9 of the National Labor Relations Act, 49 Stat. 453, as amended by the Labor Management Relations Act, 61 Stat. 136, provides as follows:

"(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer." 29 U.S.C.A. § 159.

In the case at bar a comparatively small number of discontented employees undertook by a work stoppage or strike movement to take charge of and direct the actions of their chosen bargaining representative in negotiation with their employer as to the terms of employment. We agree with what was said by the

Court of Appeals for the Fourth Circuit in N.L.R.B. v. Draper Corporation, 145 F.2d 199–203, 156 A.L.R. 989:

"* * * Minority groups must acquiesce in the action of the majority and the bargaining agent they have chosen; and, just as a minority has no right to enter into separate bargaining arrangements with the employer, so it has no right to take independent action to interfere with the course of bargaining which is being carried on by the duly authorized bargaining agent chosen by the majority."

In the Draper case the corporation and the Union there involved were engaged in negotiations over a new collective bargaining agreement. A group of employees stopped work over what they called the "corporation's stalling," they notified the superintendent of what they intended to do and walked off the job. They were discharged. The National Labor Relations Board found the corporation guilty of unfair labor practices and ordered the reinstatement and reimbursement of the employees. Its petition for the enforcement of its order was denied.

In the Draper case the Court of Appeals for the Fourth Circuit stated the question was narrowed down as to whether what was done by the Corporation amounted to an unfair labor practice. In answering, it said, 145 F.2d on page 202:

"This depends on whether or not the 'wild cat' strike, in which the discharged employees were engaged, falls within the protection of section 7 of the act. If it does, a discharge on account thereof would clearly be interference and coercion with respect thereto within the meaning of section 8(1). Cf. Western Cartridge Co. v. N.L.R.B., [7 Cir., 139 F.2d 855] supra. If it does not, the discharge and failure to reemploy would be justified and would furnish no basis for a finding of unfair labor practice. * *

we are of opinion that the 'wild cat' strike in which the employees were engaged and for which they were discharged was not such a concerted activity as falls within the protection of section 7 of the National Labor Relations Act, but a strike in violation of the purposes of the act by a minority group of employees in an effort to interfere with the collective bargaining by the duly authorized bargaining agent selected by all the employees. The purpose of the act was not to guarantee to employees the right to do as they please but to guarantee to them the right of collective bargaining for the purpose of preserving industrial peace."

Further, on pages 204–205, 145 F.2d, the court said:

"When the union was selected by the employees and recognized by the company as bargaining agent, it was understood and agreed on all sides that bargaining with respect to wages, hours and conditions of work would be carried on between the union and the company in accordance with the above quoted statutory provision, that the employees would acquiesce in action taken by the union and that they would not undertake independent action with respect to the matters they had committed to it as their authorized agency. Not only did the company agree to bargain only with the union, but the employees agreed to bargain only through the union. Those who engaged in the 'wild cat' strike violated this agreement. * * *

"No surer way could be found to bring collective bargaining into general disrepute than to hold that 'wild cat' strikes are protected by the collective bargaining statute."

The Court of Appeals for the Fourth Circuit in the Draper opinion cites Western Cartridge Co. v. N.L.R.B., 139 F.2d 855. In that case, this Court while

recognizing the exclusive right of the National Labor Relations Board to draw inferences from the evidence, did not think that the evidence supported an inference that the employer's discharge of an employee who had participated in a "wild cat" strike was for the purpose of discouraging membership in a labor union. We there denied enforcement of a portion of an order of the National Labor Relations Board, which proceeded upon the theory that the discharge of a participant in a "wild cat" strike was an unfair labor practice. In other words, we reached the same conclusion that was arrived at in the Draper case. Cf. Annotation 156 A.L.R. 998.

In a more recent case, N.L.R.B. v. Illinois Bell Telephone Co., 7 Cir., 189 F.2d 124, certiorari denied, 342 U.S. 885, 72 S.Ct. 173, 96 L.Ed. 663, this Court relied upon the decision in the Draper case. It there appeared that several telephone operators were subjected to discipline because they refused to cross a picket line set up across their approach to the plant by a union other than that to which they belonged. The Union to which the operators belonged was at the time engaged as their bargaining agent in collective bargaining with the telephone company. It was there held that the operators' activities did not constitute concerted activity within the protection of section 7 of the Act.

The record in the instant case is destitute of any evidence that the Company discouraged membership in the Union in any way, or that it has interfered with the right of the employees to organize or to join the C.I.O. Workers Union.

In our opinion the work stoppage of September 13, 1951, was not, under the facts and circumstances shown, a concerted activity for mutual aid within the protection of section 7 of the Act.

The order of the Board is set aside, and the Board's request for enforcement is denied.