**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SUNBEAM LIGHTING COMPANY, Inc., Respondent.**

**No. 13867.**

United States Court of Appeals Seventh Circuit.

May 28, 1963.

Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Solomon I. Hirsh, Attorneys, National Labor Relations Board.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, Atty., N. L. R. B., Washington D. C., for petitioner.

John Van Aken and Harvey M. Adelstein, Chicago, Ill., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for respondent.

Before CASTLE, KILEY and SWYGERT, Circuit Judges.

CASTLE, Circuit Judge.

This case is before the Court upon the petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended (29 U.S.C.A. § 160(e)), for enforce-

ment of the Board's order issued against Sunbeam Lighting Company, Inc., respondent. The Board's order and decision are reported at 136 NLRB No. 107.

The Board, two members dissenting, found that the respondent Company violated Section 8(a) (3) and (1) of the Act[1] by discharging and refusing to reinstate certain employees and ordered the Company to cease and desist from the unfair labor practices found and from in any other manner interfering with employees' rights guaranteed under the Act; to make whole for wages lost the 50 employees who were discharged for engaging in a walkout on May 3, 1960, and were denied reinstatement the following day, but 37 of whom were later reinstated; to offer reinstatement to the 13 employees who had not been reinstated as of the time of the hearing; and to post designated notices.

The employees discharged were employees who on May 3, 1960, failed to return to their work at the conclusion of a 10:00 A. M. work break period in response to demands of Company supervisors that they do so or be considered as voluntarily quitting. These and some thirty other employees had left the plant, taking their lunch pails and coats, at the commencement of the regular 10:00 A. M. work break, in expression of dissatisfaction with what the Company had characterized as its "final offer" made in connection with current contract negotiations.

In February 1960, the International Brotherhood of Electrical Workers, AFL-CIO, was certified as the collective bargaining representative of the Company's approximately 120 production and maintenance employees. The employees in the unit selected five of their number to serve on a Union bargaining committee which participated in the bargaining meetings with the Company's representatives. Kenneth Lee, an International Representative of the Union served as spokesman during the negotiations. During April 1960, Lee and the committee held a series of bargaining sessions with Company representatives. On May 2, 1960, a meeting was held at which the Company presented what it stated to be its "final offer". It was agreed that the proposal be submitted to a vote of the employees at a membership meeting. The committee determined that such meeting be held May 5, 1960. Lee suggested to the committee members that they not reveal the terms of the Company's offer until all the employees were together at the meeting. But information as to the terms of the proposal was given by committee members to a number of employees who made inquiry the following morning (May 3, 1960) and the walkout and resulting discharges followed.

■ The main contested issue is whether the walkout or strike was a protected concerted activity. The majority of the Board, supporting its Trial Examiner, concluded that it constituted "concerted activities for the purpose of collective bargaining" expressly protected by Section 7 of the Act. The Board's findings are entitled to respect but they are to be measured by whether or not they are supported by substantial evidence on the record considered as a whole. Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

■ When the record is considered as a whole it reveals a combination of factors which leads us to the conclusion that under the facts and circumstances presented the action of the minority of the employees in refusing to return to work at the termination of the work break period was not a protected activity but on the contrary constituted interference with bona fide bargaining activity in progress between the Company and the employees' certified representative. We are of the opinion that the rationale of Harnischfeger Corp. v. N. L. R. B., 7 Cir., 207 F.2d 575, and N. L. R. B. v. Draper Corporation, 4 Cir., 145 F.2d 199, 156 A.L.R. 989, is applicable here.

1. All references herein to the "Act" are to the National Labor Relations Act, as amended. 29 U.S.C.A. § 151 et seq.

The refusal of the minority group of 50 employees to return to their work at the conclusion of the work break occurred while contract negotiations were in progress and prior to the date scheduled for a meeting at which the employer's offer was to be considered by the employees. The Union, the employees' certified bargaining agent, did not call for, authorize or sanction the action. Nor did Union representative Lee, who was spokesman. A majority of the five employee bargaining committee members did not participate in the walkout. The fact that some employees who had learned of the terms of the Company offer were expressing dissatisfaction does not in our opinion support the Board's conclusion that the incident of May 3, 1960, was but an accelerated rejection of the offer. The 50 employees, a minority of the unit, had no authority to reject the offer. And, upon the showing made, we find no substantial basis for an inference that a majority had joined in an actual "rejection" of the offer. Moreover, we are of the opinion that the appraisal of the record made by the dissenting Board members (136 N. L. R. B. 1258–1264) serves to more accurately take into account and reflect those factors which fairly detract from the weight of the testimony primarily relied upon by the Board. We see no need to repeat those observations here.

We agree with the admonitions in Draper Corporation, supra (145 F.2d pp. 203 and 205) that:

"The purpose of the act was not to guarantee to employees the right to do as they please but to guarantee to them the right of collective bargaining for the purpose of preserving industrial peace.

    \*    \*    \*    \*    \*    \*

"\* \* \* there can be no effective bargaining if small groups of employees are at liberty to ignore the bargaining agency thus set up, take particular matters into their own hands and deal independently with the employer.

    \*    \*    \*    \*    \*    \*

"No surer way could be found to bring collective bargaining into general disrepute than to hold that 'wild-cat' strikes are protected by the collective bargaining statute."

And, whatever may have been the purpose or intent of the employees who participated in the refusal to resume work at the termination of the work break— or of those who instigated such action— we are of the opinion that the inherent effect of such action makes those admonitions applicable here. The record here, as in Harnischfeger, lacks the substantial support requisite to a finding that respondent violated the Act.

Enforcement of the Board's order is denied.

Enforcement denied.

KILEY, Circuit Judge (concurring).

The trial examiner found that "more than one-half of the employees" of the bargaining unit of 120 struck on the morning of May 3 during the regular company coffee break.

That finding rests on the testimony of Reynolds, a member of the bargaining committee, that "between seventy-five— between seventy and eighty" left the plant at the beginning of the break; that he learned of the "walk-out" by "seeing them outside with their coats and lunches with them, they had taken their coats and lunches with them;" that after the end of break bell had rung about thirty returned to the plant; that at the meeting that night of the seventy-five or eighty who had "walked out," about thirty-five were not present; that the next morning there were "approximately forty-five or fifty" who attempted to return to work; and that the "forty-five or fifty" represented "all of the individuals who had struck the day before."

The General Counsel had the burden of proving that more than sixty employees who left the plant at the beginning of the coffee break engaged in a strike signifying their rejection of the final offer of respondent to the bargaining committee.

I think the evidence is too thin to furnish a substantial evidentiary basis for the finding that a majority struck that morning. There is no testimony as to the precise number of employees who took their coats and lunches with them on the break. There is no basis for the Board's statement in a footnote in its brief that seventy-five or eighty had indicated that they were striking because they had "walked out" with their coats and lunch pails. Reynolds' testimony was that he saw "them" with coats and lunch pails. This question is vital because the substance of the finding of the Board, as interpreted by the Board's brief, is that the effect of what happened at the morning break on May 3 was that a majority of the 120 member bargaining unit had, by striking, informally rejected the final offer of the respondent.

It may be that there were seventy-five or eighty in front of the plant during the morning break and that all of these were dissatisfied with the progress of their bargaining committee and with what they had learned from Reynolds and others of the final offer. It seems to me that the Board in describing the event as an expression of dissatisfaction indicates uncertainty on its part as to exactly what the employees' action was. In the context in which this event occurred and because of the vital nature attributed to the action of the employees by the Board, the only reasonable inference that can be drawn is that fifty-one who did not return to work struck and the balance had expressed dissatisfaction but had not struck.

Respondent in its hurried response to the action mailed fifty-one letters to members who were refused work the following day, and it seems plain to me from Reynolds' testimony that only fifty-one of those who were outside the plant at the morning break actually refused to work. There is not substantial evidence that all, or the greater number, of the thirty returned under threat of having their cards pulled or had their lunch pails and coats with them.

There is no necessity of discussing here the right to strike, or whether employees may strike only under union authorization, or whether less than a majority of employees may lawfully strike. A strike vote need not depend upon the formality of Robert's Rules of Order, but before an inference can be drawn that a majority of employees by their conduct rejected the final offer, there ought to be more evidence than is in the record here, that a majority struck.

The 120 employees here selected the International Brotherhood of Electrical Workers as a collective bargaining agent. They chose a bargaining committee from among themselves, and non-employee Lee, representing the Union, was spokesman for the committee. There was increasing dissatisfaction with the progress of the committee and a threatened strike during the week previous to the event subject of this proceeding. The bargaining unit did not revoke the authority of the bargaining committee. The Board found that in substance it was strengthening the committee's hand.

The committee, through Lee, promised respondent that the final offer would be submitted to a meeting of the bargaining unit on May 5. The following day fifty-one dissatisfied employees refused to work. It is true that respondent made no attempt to conciliate the men and seemed eager to exploit the event which the unprotected activity presented it. Respondent, however, was entitled to the good faith performance of the promise of the bargaining committee and the employees should have approved or disapproved the "final offer" through the bargaining committee they had chosen.

This choice had been made in accordance with the orderly procedure contemplated by the collective bargaining principle. It seems to me that the peace and order aimed at through that principle is frustrated when members of the bargaining committee strike as a means of strengthening the hand of the committee they have chosen to represent them, while simultaneously and ostensibly maintaining the authority of the committee. The effect of what was done by the employees who refused to work was, in my view, to detract from the dignity and power of

the committee and to place the respondent in a dilemma as to where the power to negotiate for the employees rested.

I think the conduct of the fifty-one employees who were not rehired on May 4 removed them from the protection of the Act.

SWYGERT, Circuit Judge (dissenting).

I find that I must dissent.

The National Labor Relations Board's trial examiner found that more than half of the employees in the bargaining unit of 120 walked out of Sunbeam's plant in Gary, Indiana, on the morning of May 3, 1960. This action followed the Company's "final offer" of a collective bargaining contract on May 2 and the Union representative's (Lee) statement to the Company that it would be presented to the Union membership for consideration.

After approximately 75 to 80 employees walked out at 10:00 a. m., Company supervisors circulated among the employees outside the plant. The men were told to "come back to work, or their cards would be punched and they would be considered as voluntarily quitting" for violating a plant rule requiring permission before leaving their work. As a result, approximately 30 employees returned to the plant and normal operations were resumed at 11:00 a. m. Approximately 51 employees remained outside the plant, however, or went home. That afternoon Sunbeam mailed discharge notices to these employees.

Late in the afternoon of May 3, bargaining committee chairman Reynolds received a telegram from Lee who was in Chicago. The telegram read:

"In discussing the current sitiation [sic] at Sunbeam with our Sixth

District International Office it was decided to inform the members of the negotiating committee that until further notice, there will be no further union or negotiating meetings while the unauthorized work stoppage continues."

A Union meeting was held that evening. Most of the 51 strikers attended. Reynolds read Lee's telegram. The members attending the meeting then voted unanimously to return to work the next morning.

On the morning of May 4, those of the 51 employees who had not yet received the discharge letters reported at the plant at the regular time for work. The plant superintendent met them and told them that they would not be permitted to work; that they had "terminated [them] selves" by walking out the day before; and that their checks would be mailed to them.[1]

I agree with the Board that this was not a "wildcat" strike. The trial examiner and the Board were justified, I think, in holding that a majority of the plant's employees went on strike to express their feelings about Sunbeam's "final offer". This was not action by a dissident minority of the bargaining unit attempting to subvert the majority's objectives or to undermine the Union leadership. Rather, as the Board pointed out, it was a "spontaneous reaction of [a majority of] the employees to the Respondent's offer" which was actually in support of the aims of the Union.

That some thirty employees acceded to the threats of the supervisors following the work stoppage does not militate against the fact that the walkout was actually engaged in by a majority of the Union members or that it constituted a practical rejection of the Company's proffered contract terms.

1. The mailing of the discharge notices within hours of the walkout and the refusal to reinstate the strikers the following morning when they reported for work at the usual time evinces a precipitate seizure of an opportunity on the part of Sunbeam to weaken the Union Its anti-

union animus is highlighted by the fact that when one of the returning strikers asked permission to get his coat, he was told that he could not enter the plant for anything and his coat would be brought to him.

I do not think that either the rubrics of a formal strike vote or formal authorization by a union representative is prerequisite to gaining Section 7 protection for concerted activity. N. L. R. B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 293 (1962). The employees here should not be deemed to have lost their Section 7 rights merely because they failed to follow a formal pattern in rejecting the Company's proposed contract terms. The fact of rejection by a majority was made clear; the Company was not entitled to insist on more.

Both the majority and the concurring opinions seem to assume that a finding that a majority of the members of the bargaining unit went on strike is prerequisite to a holding that this was not a "wildcat" strike. No authority is cited for such a proposition and, indeed, I do not think it can logically be maintained in the present factual situation.

Once the requirements of good faith bargaining have been met and a stalemate has come about, as here, even a minority, in my opinion, which in good faith believes it is acting in support of and consonant with the union's aims in rejecting an employer's "final offer" may take collective strike action to force the union's demands on the employer. Such action is not in derogation of or in conflict with the bargaining unit's aims. Certainly, it is not that kind of minority action constituting internecine factionalism condemned by the "wildcat" strike exception to employees' Section 7 rights.

In the instant case immediately upon learning from the Union's business representative that the Union considered the strike to be unauthorized, the strikers sought to return to work. Obviously union discipline is not an issue.

In my opinion the record considered as a whole shows that the discharged employees were engaged in protected, concerted activities within the meaning of Section 7 of the National Labor Relations Act. I would enforce the Board's order.