WESTERN CONTRACTING CORPORA-
TION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 7208.

United States Court of Appeals
Tenth Circuit.

Sept. 25, 1963.

Lewis, Circuit Judge, dissented.

Keith E. Taylor, Salt Lake City, Utah (C. C. Parsons, Calvin A. Behle, Elliott W. Evans and George W. Latimer, Salt Lake City, Utah, with him on the brief), for petitioner.

Ira M. Lechner, Washington, D. C. (Stuart Rothman, Dominick L. Manoli, Marcel Mallet-Prevost and Allison W. Brown, Jr., Washington, D. C., with him on the brief), for respondent.

Before MURRAH, Chief Judge, LEWIS, Circuit Judge, and DOYLE, District Judge.

DOYLE, District Judge.

Pursuant to Section 10(e) and (f) of the National Labor Relations Act, as amended,[1] the Western Contracting Company has petitioned to review and to set aside an order of the National Labor Relations Board issued October 18, 1962.[2] The attack is against the findings of the Board that petitioner had

violated Section 8(a) (1) and (3) of the Act by discharging employees who had [3] engaged in an economic strike and by refusing to rehire them and by threatening reprisals. There was a work stoppage and the central issue is whether it was protected union activity or whether, as petitioner maintains, the employees were engaged in a legally-unprotected "wildcat" strike.

During the period in question, January 15 to January 22, 1962, petitioner was engaged, under contract with Kennecott Copper Corporation, in removal by truck of the overburden lying above the mineral-bearing strata in the open pit mine of the Kennecott Company located at Bingham, Utah.

The employees involved in the work stoppage were truck drivers who were engaged in hauling the overburden from the mine. They were members of Local No. 222 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Petitioner had signed a collective bargaining agreement with the Union at the time of commencement of its operations at the Bingham mine in the latter part of 1958. From the winter of 1959 until the happening of the events here under review, the Union had endeavored to persuade petitioner to install hot water heaters in the trucks. Petitioner had consistently maintained that this was not feasible; that its position was taken on advice of its engineering department. It was this heater controversy which finally erupted on January 15, 1962.

The work stoppage which culminated in the discharges of the employees and which led to the Union's complaint to the Labor Board, had its origin not with Union representatives, but with the truck drivers themselves. It started on the morning of January 15, 1962 at about 8:30. The weather was cold and one of the drivers (Gary Stephenson) was warming his feet beside a fire when another driver (Ralph Tolman) stopped his

1. Title 29 U.S.C. § 160(e) and (f).

2. 139 N.L.R.B. No. 17.

3. (according to the Board)

truck and discussed with Stephenson the need for heaters. Other drivers came on the scene and soon all of the day shift drivers except one were present. They communicated their demand for heaters to the day haul foreman who told them to see the project superintendent, one Tom Speight. They thereupon parked their trucks and proceeded to the grease shack to await the arrival of the project superintendent.

At the time there were present nine of a total of eleven day shift drivers. Speight asked the employees who their ringleader was and to whom he should talk. Tolman replied that there was no ringleader, that the drivers were acting together and that they wanted hot water heaters for their trucks. Speight's reply was that hot water heaters were not feasible and that the matter had been discussed before and that he would like to have everybody go to work; that should the men not decide to drive their trucks, they should go home. One of the employees then suggested that they call a business agent of the Union and two of them proceeded to a telephone and placed a call to Alma May, a union organizer. May agreed to come to the jobsite and try to arrange a meeting with Speight.[4]

Meanwhile, Speight had called May, informed him of the shutdown, and requested that he come to the project. Later in the day a meeting was held at Speight's office. Four of the employees with two Union representatives met with Speight who told May what had happened and said that someone was going to have to pay for the loss of time to the company. May's reply was that the Union had not called the strike although it was in full sympathy with the action taken by the employees.

Discussion was had about the failure of the company to tighten the windshields and doors as it had promised, and to furnish the heaters. Speight told the group that the company's position on the heaters was the same as it had been. Two of the employees, Tolman and Keith, interposed some arguments and Tolman reminded Speight that the scout truck which he drove had a heater in it. According to Tolman, Speight said, "You are not working for Western as of this morning when you opened your mouth." No agreement was reached and the job was shut down by petitioner at eleven o'clock. The employees then met with May at the Union hall and made efforts to contact the night shift.

A meeting was held at the Union hall that evening and all the employees except one or two, were present. A vote was taken and the majority voted not to return to work until heaters were installed in the trucks. A committee was chosen to meet with the Union representative and the petitioner.

In order to head off the night shift, the employees stood at the side of the road and flagged down the drivers as they passed. While they were engaged in doing this Speight appeared and he asked one of them if he knew he could be sued for this activity.

On January 17, Speight met with the Secretary-Treasurer of the Union and May at the Union hall. Effort was made to persuade Speight to return the drivers to the job and install hot water heaters in the trucks. This was to no avail. However, Speight did agree to fill the holes in the floors of the cabs and to repair the doors and windshields; he also agreed to provide the drivers with flying suits. There was also discussion concerning the reemployment of the men. This offer was reported to a meeting of the entire membership the next day. The offer was presented and was followed by a vote of fifteen to twelve to not return to work until the heaters were installed.

On January 19, Latter, Secretary-Treasurer of the Union, called Speight

4. Before going to the jobsite May called Fullmer Latter, the secretary-treasurer for the Union, to inquire about the Union's position on the strike. Latter said that while the Union could not take responsibility for the strike they would lend full cooperation to the employees.

and told him of the refusal vote. On the following day Latter again called Speight and made an effort to have a further discussion but Speight stated that he had changed his mind and that the agreement they had reached previously was no longer acceptable. He asked Roy Tolman and the men to return to work on Monday morning and said that he was going to discharge the men and would rehire all except five of them. He placed an order with Latter for ten men for the day shift and six for the night shift and stated that these men would report on Monday morning and that they would then be hired. Latter then recommended that they go back to work unconditionally. On the morning of January 22, the twelve employees who were directly involved in the dispute were given referral slips to the petitioner. However, the men were not immediately employed; instead, each man was given his termination papers at the direction of Speight, who admitted at the hearing that the employees were discharged because they engaged in a strike. Shortly after the discharge Speight talked to the men and rehired seven of them, those who did not have the "no heater, no work" proposition in mind. Five of the men were not rehired.

On the basis of the above facts, the Board concluded that the company violated section 8(a) (1, 3) of the Act by terminating the twelve employees and by refusing to reinstate five, notwithstanding their unconditional application for reinstatement. The Board found that the firing and the refusal to rehire were because of the participation in the strike which was found to be a concerted Union effort. The petitioner's contention that the strike was unauthorized and in derogation of the Union's position was rejected, the Board finding that while the Union had not adopted or ratified the strike, it nevertheless had supported the employees' action and had bargained with the petitioner in respect to the demands which had precipitated the strike. The Board's findings pointed out that the hot water heater demand had long been sought by the Union as further evidence that the strike action was not in derogation of the Union's position. It was found and concluded that the collective bargaining agreement did not contain a "no-strike" clause and that the petitioner had failed to sustain its burden of proof that such a clause had been omitted from the contract by inadvertence.

A further conclusion was that the company violated section 8(a) (1) of the Act by threatening two of the employees with reprisals for engaging in activity which was part of the strike.

On the vital issue here presented as to whether the strike was Union activity, the full text of the Board's finding is as follows:

"The evidence in this case is clear that the strike which began on January 15, 1962, was not called by the Union but was the result of action taken by the employees themselves. It is equally clear that when the Union learned of the strike it supported the employees in the action they had taken and attempted to convince the Respondent that it should grant the demand of the employees for hot water heaters as a means of resolving the dispute. The Union itself had long sought to have the Respondent accede to such a request. The action taken by the employees was therefore in support, and not in derogation, of the position taken by the Union. It is this factor, I believe, which becomes the touchstone for determining whether a withholding of their services by the employees is to be regarded as sanctioned by the Union and therefore not in the nature of so-called 'wildcat' action. If the position taken by the employees is contrary to that of their bargaining representative, the bargaining process itself may thereby be impaired or destroyed. N. L. R. B. v. Draper Corporation, 145 F. 2d 199, 156 A.L.R. 989 (4th Cir.). But a position taken by the employees in support of that of their bargaining representative creates no

such threat. The demand of the employees in this case and of the Union which represented them was one and the same. Under these circumstances, I can see no basis for finding that the strike which began on January 15, 1962, was unlawful as without sanction by the Union and therefore deprived those who struck from the protections otherwise guaranteed in the Act. Sunbeam Lighting Company, Inc., 136 NLRB No. 107; Philanz Oldsmobile, Inc., 137 NLRB No. 103."

In support of its request that the order be vacated and set aside, petitioner makes these points:

1. That the strike in question was "wildcat" in nature whereby the employees involved sought to take charge of and direct the actions of their bargaining representative in negotiations with the employer; that this action was unprotected and violative of the Act, and that their discharge was, therefore, not contrary to any provision of the Act;

2. That a "no-strike" provision was omitted from the collective bargaining agreement by mutual mistake; that the Board erroneously found to the contrary;

3. That even if the Union adopted, approved and supported the strike, its action violated the provisions of the collective bargaining agreement, whether or not a "no-strike" provision was contained in it;

4. That the Board erred in finding that petitioner discriminated against the employees in regard to hire or tender of employment in a manner designed to encourage or discourage membership in the Union and in concluding that such discrimination violated Section 8(a) (3) of the Act.

## I.

The ultimate issue is whether the finding of the Board that the action taken by the employees was in support of the Union rather than in derogation of it is supported by substantial evidence. Although it is undisputed that the concerted action of the employees originally taken was spontaneous and was not sponsored by the Union as such, it is equally clear from the evidence that the union supported and lent its aid to the strike. The heater dispute had existed for some period of time and the union had always and consistently supported the employees in this demand. The only evidence which even suggests employee action which could be considered opposed to the position of the Union is the statement of May at the very outset of the incident that the Union had not called the strike. The force of this statement is neutralized by his additional statement that the union was in full sympathy with the action taken by the employees. There is strong evidence in support of the finding that the action of the employees was not opposed to the stand of the union. On the day of the work stoppage and immediately after the initial meeting, the union representatives joined the employee effort to obtain the heaters. Several employee meetings were held and votes were taken. The union officials carried on the discussions with the company and made repeated efforts to satisfy the employee demands. It is reasonable to conclude from these facts that the activity in question constituted union endeavor and was not a "wildcat strike."

But, in addition, the conduct of the employees here must be regarded as *majority* action for the following reasons: Although this conduct had its origin with the protest of the nine (of a total of eleven) day-shift drivers who constituted, it is true, a minority of the total employees, this group was joined soon after the first incident by the night-shift drivers. Finally, a majority of all of the truck drivers voted to not return to work until the heaters were installed. The events commencing January fifteenth and culminating in the firing and refusal to rehire on January twenty-second constituted a continuous and connected transaction. To construe the evidence so as to conclude that the work stoppage was in law minority action requires one to isolate and separate the original protest and to treat this as the

only significant event. Such a disproportionate emphasis is not justified. The subsequent and resultant occurrences must also be considered and when all of the facts are weighed the conduct clearly takes shape as that of the majority.

Petitioner argues that the action of the employees here in originating the strike and in repeated refusal to return to work unless the heater condition was accepted by the company effectively relegated the union as such to an inferior position—one of mere liaison. This fails to recognize that the union came into the controversy at once and supported the employee position. The facts here do not bring the case within the scope of the decisions rendered by the seventh and fourth circuits in Harnischfeger Corp. v. N. L. R. B., 207 F.2d 575 (7 Cir.) and N. L. R. B. v. Draper Corp., 145 F.2d 199, 156 A.L.R. 989 (4 Cir.) In each of these cases a strike occurred during negotiations between the union and management. In each instance the strike was by a minority of employees who were dissatisfied with the progress of negotiations. It was held in both cases that this conduct constituted an interference with the right of the majority to negotiate with the employer through their designated representative. In Draper the strike was conceded to be a "wildcat" strike which was independent of and contrary to the union position. The only issue, as stated by the Court, was:

"* * * whether what was done amounts to an unfair labor practice within section 8(1) of the act. This depends on whether or not the 'wild cat' strike, in which the discharged employees were engaged, falls within the protection of section 7 of the act. If it does, a discharge on account thereof would clearly be interference and coercion with respect thereto within the meaning of section 8(1). Cf. Western Cartridge Co. v. N. L. R. B., supra [7 Cir., 139 F.2d 855]. If it does not, the discharge and failure to reemploy would be justified and would furnish no basis for a finding of unfair labor practice.

\* \* \* \* \* \*

"* * * we are of opinion that the 'wild cat' strike in which the employees were engaged and for which they were discharged was not such a concerted activity as falls within the protection of section 7 of the National Labor Relations Act, but a strike in violation of the purposes of the act by a minority group of employees in an effort to interfere with the collective bargaining by the duly authorized bargaining agent selected by all the employees."

A more recent case which has been brought to our attention is that of the Seventh Circuit in National Labor Relations Board v. Sunbeam Lighting Company, Inc., 318 F.2d 661. In that case bargaining was in process when the strike occurred. The company had made its offer but it was agreed that the membership would not be notified of this until it could be formally submitted to a vote. The terms of the offer leaked out and a spontaneous strike took place following the morning coffee break. The comments of the Court served to differentiate the Sunbeam case from the case at bar:

"The refusal of the minority group of 50 employees to return to their work at the conclusion of the work break occurred while contract negotiations were in progress and prior to the date scheduled for a meeting at which the employer's offer was to be considered by the employees. The Union, the employees' certified bargaining agent, did not call for, authorize or sanction the action. Nor did Union representative Lee, who was spokesman. A majority of the five employee bargaining committee members did not participate in the walkout. The fact that some employees who had learned of the terms of the Company offer were expressing dissatisfaction does not in our opinion support the Board's conclusion that the incident of May 3, 1960, was but an accelerated rejection of

the offer. The 50 employees, a minority of the unit, had no authority to reject the offer. And, upon the showing made, we find no substantial basis for an inference that a majority had joined in an actual 'rejection' of the offer. Moreover, we are of the opinion that the appraisal of the record made by the dissenting Board members (136 N.L.R.B. 1258–1264) serves to more accurately take into account and reflect those factors which fairly detract from the weight of the testimony primarily relied upon by the Board. We see no need to repeat those observations here."

The case before us is substantially different from those which were before the respective courts in Draper, Harnischfeger and Sunbeam. Here, the strike was not by a minority of the employees. Secondly, the employer and the union were not engaged in bargaining with respect to the very dispute over which the strike action was taken. In the present case there was a genuine Section 7 dispute regarding conditions of employment, which dispute was one of long standing between the employer and the union. The employees were entitled to engage in concerted action so long as such action was not in violation of their contract or in derogation of the position taken by their bargaining agent. The action here was clearly in support of rather than in derogation of the union's position. The single factor that employee action had a spontaneous origin with individual employees is insufficient to bring the case within the principle enunciated in the cited decisions.

It follows that the board's viewpoint as expressed in its findings and conclusions on this subject is adequately supported.

## II.

Petitioner's contention that there was a mutual mistake of fact whereby the "no strike" clause of the contract was omitted as a result of inadvertence derives from the history of the negotiations between the parties and the circum-

stances surrounding the execution of the current agreement. In December, 1958, before petitioner commenced its work at the Bingham mine a conference was held between Speight; Everist, representing petitioner; and Latter, on behalf of the union. Speight advised Latter that they would take the Associated General Contractors' (AGC) agreement. This *form* contract had a "no strike" clause in it; however, no such clause was included in the executed agreement. In the year 1959 there were negotiations and changes, the first union submission having been unacceptable to petitioner. Here again, the "no strike" clause was not included. The 1960 contract (the current one) was, according to Speight, presented and accepted as an AGC contract. This was signed by Speight after he had read it and had made a handwritten change. This did not contain a "no strike" clause. The union was represented by May in the negotiations. He maintained that the signed agreement was the very contract which he negotiated and intended to sign. He further testified that there was no mistake, and that he made no agreement which was at variance with that which was signed.

The trial examiner rejected the analysis of the facts offered by petitioner and accepted May's testimony, reasoning that the conduct of May during the stoppage was inconsistent with his entertaining a belief that such a clause was in the contract. The examiner noted that Speight's conduct after the strike was also inconsistent with a belief that petitioner was protected by such a clause; he at no time sought to insert such a clause so as to supply the omission even though the contract had a considerable time to run before its expiration, and further noted that the inference to be drawn from the fact that the clause was a voluminous one providing grievance machinery and arbitration procedure was that it could not be easily overlooked. Finally, the examiner concluded that:

"* * * On the record as a whole, and on the basis of the foregoing facts, I find that the evidence

does not establish the existence of a mutual mistake as to the contract which was executed or as to the fact that it did not contain a no-strike clause. In this connection, I credit the testimony of May."

 A presumption arises from the instrument itself that it fully and clearly sets forth the true agreement of the parties and where mutual mistake is alleged the burden is on the party alleging the mistake to prove that the written instrument does not fully or clearly state the agreement intended to be executed.[5] Moreover, the proof in such case must be clear and convincing.[6] Mere proof of unilateral mistake unaccompanied by fraud or unconscionable conduct on the part of the other party is insufficient.[7] The mistake must be mutual and common to both parties to the instrument. It must appear that both have done what neither intended.[8]

 In the light of the strictness of the mutual mistake rule, it cannot be said that the evidence here adduced was such that we are now compelled to hold that the examiner's alignment of the facts, together with his findings (approved by the Board) as to credibility of witnesses was erroneous and unsupported.

### III.

 Irrespective of the presence in the agreement of the "no strike" clause, or of whether the work stoppage was union activity, there was in any event, according to petitioner, a violation of Article I, paragraph 5 of the collective bargaining agreement.[9] This provision

prohibits the union from permitting or requiring any limit upon rates of production. It also enjoins refusal to operate equipment or tools intended to speed or increase efficiency of the operation. The Board construed this clause as eliminating the union's power to object to the use of automated equipment and as barring employee slowdowns in production rate, but held that it did not "constitute an agreement not to strike for other reasons or in relation to other conditions of work which might lead to dispute." The Board added:

> " * * * It is neither counterbalanced by a promise on the part of the employer not to lock out, nor is it the quid pro quo for a system providing for the handling of grievances and a resort to arbitration in the settlement of disputes, as is commonly found where broad no-strike clauses appear in collective bargaining agreements. See Textile Workers Union [of America] v. Lincoln Mills, 353 U.S. 448 [77 S.Ct. 912, 1 L.Ed.2d 972]."

We agree with the Board that paragraph 5 could not operate as a general "no strike" clause which in and of itself rendered the work stoppage unlawful.

### IV.

 From the conclusion that the work stoppage was union activity which was not prohibited by any provision of the collective bargaining agreement, it follows that the action of petitioner in refusing to reinstate five of the striking employees was a violation of Section 8 (a) (1) and (3) of the Act.[10]

---

5. Metzler v. Bolen (D.C.No.Dak., 1956), 137 F.Supp. 457.

6. Maryland Casualty Co. v. United States (8 Cir.), 169 F.2d 102; Metzler v. Bolen, supra; McKnight v. National Surety Corp. (E.D.Ark.E.D., 1958), 159 F.Supp. 625, 628; Carlson v. Kentucky Ridge Coal Co. (D.C.E.D.Ky., 1954), 125 F. Supp. 257, 259.

7. McKnight v. National Surety Corp. (note 6)

8. United States v. Northern Pacific Ry. Co. (8 Cir.), 188 F.2d 277.

9. "The Union shall not countenance, permit or require any limit upon or curtailment of rates of production within their respective jurisdiction, or craft, and shall not object to, refuse to operate, or otherwise hamper the use of any equipment, machinery, tools or devices within their craft intended to speed or increase the efficiency of the Employer operations."

10. Title 29 U.S.C. § 158(a) (1, 3). These sections provide in pertinent part:
 "(1) to interfere with, restrain, or coerce employees in the exercise of the

As to the violation of Section (a) (3), supra, petitioner maintains that there is a dearth of evidence to establish that its motivation was to discourage membership in any labor organization. However, specific intent does not appear to be a necessary element.[11] Thus, where the natural and probable consequences of the action of the employer is to discourage union membership, the employer will not be heard to say that he entertained no such intent or motive. Consistent with our findings that the employees were engaged in valid union activity, it follows that the efforts of petitioner having a natural tendency to discourage union membership, constitute a violation of Section 8(a) (3).

We find no error in the proceedings before the Board. It is, therefore,

Ordered that the Board's action be enforced.

LEWIS, Circuit Judge (dissenting).

I must respectfully dissent.

The premise of the main opinion is that a *majority* of the employees engaged in concerted activity which was not in derogation of the position taken by their bargaining agent. Could I find support in the record for such premise I would be in complete accord. But I do not think it proper to examine events that occurred long after petitioner's job was effectively struck and was completely shut down to determine whether the employees' action was concerted, a majority, and protected activity.

At about 8:30 a. m. on June 15 nine employees, admittedly but a small minority of the bargaining unit, walked off the job and caused petitioner's entire project to shut down at 11:00 a. m. These nine employees initiated and effectuated a strike without consulting with their union membership or their bargaining agent and with no knowledge or concern for the wishes of their fellow members, their bargaining agent, or the orderly process of collective bargaining. In fact, upon receiving word of the strike, the Union immediately and emphatically disclaimed any responsibility for the strike but indicated it would cooperate with the employees in negotiations; on June 18, three days later, the will of the majority[1] became apparent when by a vote of 15 to 12 the employees agreed not to work; and, finally, on June 22, the employees, after completing orderly collective bargaining, voted to and did return to work unconditionally.

It seems to me that the validity of this strike must be tested against conditions that existed at the time of the strike and cannot gain comfort from subsequent events. The principles of collective bargaining contemplate the reflection of the will of the majority through a designated bargaining agent. The process does not contemplate coercive action by a handful of employees and a subsequent determination of the validity of such action by use of bargaining and vote. The Act contemplates the democratic procedure of discussion, vote, and then action. In the case at bar the procedure is reversed and seems to me to corrupt traditional collective bargaining.

I would infer from the reasoning of the main opinion that had the eventual vote of the employees been 15 to 12 *against* the strike that the action of the original nine would not then be majority

rights guaranteed in section 157 of this title;"

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *"

11. Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. National Labor Relations Board, 347 U.S. 17, 45, 74 S.Ct. 323, 98 L.Ed. 455, and Local 357,

International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. National Labor Relations Board, 365 U.S. 667, 675, 81 S.Ct. 835, 6 L.Ed.2d 11.

1. The majority opinion states that the night shift "joined soon after the first incident * * *." But the night shift knew nothing of the strike and was flagged down en route to work. The job was shut down and they couldn't work.

action nor protected concerted activity. I understand the position of the Board to be much broader for in the case at bar it relies on its earlier decision in Sunbeam Lighting Co., Inc., 136 N.L.R.B. 107. Sunbeam has now been reversed by the Seventh Circuit, National Labor Relations Board v. Sunbeam Lighting Co., Inc., 7 Cir., 318 F.2d 661, and I am unable to distinguish, as do my Brothers, the principles of that case as expressed by Judges Castle and Kiley from those here involved.