**PLASTI-LINE, INCORPORATED, and Harry W. Brooks, Ralph P. Brooks and Bruce Edwards, d/b/a Sign Fabricators, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 13958.

United States Court of Appeals Sixth Circuit.

May 27, 1960.

M. W. Egerton, Sr., Knoxville, Tenn. (M. W. Egerton, Sr., Knoxville, Tenn., of counsel, Egerton, McAfee, Armistead & Davis, Knoxville, Tenn., on brief), for petitioners.

Norton J. Come, Washington, D. C. (Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Norton J. Come, Deputy Asst. Gen. Counsel, National Labor Relations Board, Washington, D. C., on brief), for respondent.

Before O'SULLIVAN,* Circuit Judge, and BOYD and THORNTON, District Judges.

* On the day of the oral argument of the case in this Court, Judge O'Sullivan was a District Judge sitting by designation. He was sworn in as Circuit Judge on April 4, 1960.

BOYD, District Judge.

The Plasti-Line, Inc., and Sign Fabricators, Inc., have petitioned this Court to review the National Labor Relations Board which found the petitioners guilty of unfair labor practices and to set aside its order of June 2, 1959. The Board filed an answer requesting enforcement of its order against the petitioners.

A hearing upon the complaint was held by a Trial Examiner who made an intermediate report containing findings of fact, conclusions of law and recommendations for order. Petitioners filed exceptions to the Examiner's report which were considered by a five member panel of the Board.

The Board adopted the findings, conclusions and recommendations of the Trial Examiner. It found, with two members dissenting, that the petitioners had discharged thirteen employees in violation of Section 8(a) (1) and (3) of the Labor Management Relations Act which is found in 29 U.S.C.A. § 158, as follows:

"*Unfair labor practices*

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; [1]

\* \* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment encourage or discourage membership in any labor organization."

The petitioners requested an oral hearing before the Board which was denied, the Board being of the opinion that the record, exceptions and briefs adequately presented the issues as between the parties.

The petitioners are Tennessee Corporations with principal offices and plant at Knoxville, Tennessee, where they employ approximately one hundred workers in the manufacture of plastic products and electrical signs. For the purposes of this proceeding, the two corporations are regarded as a single employer. They make and sell their products in interstate commerce and during the time in question were engaged in commerce within the meaning of the Act.

The principal issue in the case is whether the discharge of the thirteen production and maintenance employees on March 15, 1957, and the subsequent refusal to reinstate them, were unfair labor practices within the meaning of Section 8(a) (1) and (3) of the Act.

By way of background to a discussion of the issues, these are the facts. Pursuant to a Board conducted election, the Union involved herein (Sheet Metal Workers International Asso., AFL–CIO) was certified by the Board in early February 1957 as the exclusive bargaining representative of the petitioners' employees. Thereafter, effective February 28, 1957, a collective bargaining agreement was entered into between the petitioners and the Union which contained, among other things, a no-strike provision and which provided definite grievance and arbitration procedures for the settlement of disputes arising between the parties.

Shortly following the execution of the contract, thirteen of petitioners' employees, on Friday, March 15, 1957, at about 2:40 p. m., clocked out without permission from petitioners or the authority of their certified representative. They assembled themselves at a point on the public road in front of the plant. A

---

1. 29 U.S.C.A. § 157. Right of employees as to organization, collective bargaining, etc.

"Employees shall have the right of self-organization to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in Section 158(a) (3) of this title."

short while later petitioners' General Foreman, Everett Allred, approached the employee group and advised, in effect, that if the members thereof desired to retain their jobs it would be necessary that they immediately return to work. Some of the group returned to the plant about 3:25 p. m., talked to other employees and left at the regular quitting time of 3:30 p. m. Although they admit having seen various supervisors, not one of them reported his return by clocking in or reporting either to Allred or one of the supervisors. Only one of the men, Oglesby, claimed to have returned to his work station. The time cards of seven of the men show that they did not clock in and that they were clocked out at about the regular time. The time card of one of the strikers reveals it was not clocked at any time after he left the plant at 2:53 p. m. There is no evidence as to whether the other five employees in any way complied with any order or ever returned to their jobs in petitioners' plant.

Later, that same afternoon, a letter discharging the thirteen striking employees was mailed to each of them. The next working day, Monday, those of the thirteen employees who reported to the plant were told by the General Foreman, Allred, they would have to leave. No striker protested, although Allred was the same person who had advised them to return to their jobs, reporting through him. At a meeting of the Union that Monday evening the strikers presented their case to the membership, claiming they had been unfairly treated, but the Union voted not to support them. Following this, and not withstanding the grievance procedures provided in the contract, not one of the strikers availed himself of his rights thereunder. Some four months following the walkout herein, eight of the strikers filed charges of unfair labor practices. None, however, were filed nor was testimony given by five of the strikers before the Trial Examiner.

It should be stated that the particular complaints which led to the minority wildcat strike herein were twofold. One, the case involving an employee who had been discharged for an unexcused absence and who, upon his return with a statement from his doctor, was restored to duty with full seniority. This came about only after an agreement was reached between petitioners and the Union relative thereto. Such closed the matter as far as the parties were concerned.

The second involved a question of pay for employees transferred from one job to another. This matter had already been processed through step one under the procedure provided for settlement of disputes under the contract. The bargaining agent agreed this issue was being considered and settled in an orderly manner under the grievance procedures of the contract. Mr. Kelly, the so-called leader of the striking group, was aware of this fact and was reminded thereof by the President of the Union on the day of the strike. Thus, the Union had taken its position on these matters and the striking group responded to this position with the strike in direct defiance of the purpose of the Act under which they now seek redress. Their action eliminated all doubt but that the strikers were dissatisfied with the settlements reached by their representative and with the orderly disposition of the grievances by it.

True, certain seniority rights of the striking group were affected, but petitioners were not empowered to change or alter the situation by dealing with this minority group concerning these matters. To have done so would have resulted in a violation of the petitioners' obligations to the certified bargaining representative under the contract and also a violation of Section 8(a) (5) of the Act. Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007.

The Board, in considering this case, held that all who participated in the strike were engaged in "concerted activities for the purpose of collective bargaining or other mutual aid or protection," within the meaning of Section 7 of the Act, and that the discharge and refusal to reinstate them was interfer-

ence, restraint or coercion with respect to their right to engage in such concerted activities, denounced as an unfair labor practice by Section 8(a) (1) of the Act. The Board further ruled that such discharge and refusal to reinstate constituted "discrimination in regard to hire or tenure of employment * * * to encourage or discourage membership in any labor organization," which is condemned as an unfair labor practice by Section 8(a) (3) of the Act. The Board's decision and order are reported in 123 N.L.R.B. at page 173.

The first of the above mentioned holdings of the Board, it seems, was based upon the fact that the cause of the discharge herein was the minority strike, and that since this was protected under Section 7 of the Act (29 U.S.C.A. § 157), petitioners thereby violated Section 8(a) (1). We, under the facts and circumstances of this case, find no justification for such a ruling by the Board.

▮▮ The Act is based upon the principle of promoting industrial peace through collective bargaining and an orderly settlement of disputes. The law imposes on the employer the positive duty to bargain with the representative of the majority of his employees and not to bargain with any other. Therefore, a minority group must acquiesce in the decisions and actions of such representative. As was appropriately said in N. L. R. B. v. Draper Corp., 4 Cir., 1954, 145 F.2d 199, 204, 156 A.L.R. 989:

"The effort of the minority was thus to take the bargaining out of the hands of the legally chosen representatives and proceed with it themselves; and, if a discharge * * * is justified, where a minority of employees, in the absence of a bargaining agent, go on strike because of the refusal of the employer to deal with them, certainly the discharge is justified where the only reason for the strike is the refusal to deal with a minority which is seeking to usurp the functions of the agent chosen by the majority."

The Court, in the Draper case, supra further stated in this regard that we

"* * * do not mean to say, of course, that a strike can be called only by a bargaining union, or that less than a majority of employees will not be protected when they go on strike in protection of their rights. * * * What we do mean to say is that minorities who engage in 'wild cat' strikes, in violation of rights established by the collective bargaining statute, can find nothing in that statute which protects them from discharge. * * * No surer way could be found to bring collective bargaining into general disrepute than to hold that 'wild cat' strikes are protected by the collective bargaining statute."

Here the strike was called and carried on by an irresponsible minority, contrary to the act, the contract between the parties, and in defiance of its bargaining representative.

▮▮ No other action, no subsequent discrimination, no hostile or coercive act is presented or proven. In fact, the General Counsel, at the conclusion of the hearing before the Examiner, conceded that the walkout itself was unprotected. We, therefore, conclude on this phase of the case the walkout here was contrary to the spirit and letter of the National Labor Relations Act and not one entitled to protection as being "concerted activities for the purpose of collective bargaining or other mutual aid or protection" under Section 7 (29 U.S.C.A. § 157) of the Act. Although the strike herein was not protected, the Board concluded the action of Mr. Allred after the walkout in requesting the strikers to return to work, condoned the activity, thereby elevating it to protected status. This latter conclusion, as we see it, is not in any sense warranted, there is no substantial evidence to support it and same is in direct conflict with the doctrine of condonation in cases of this type. The test, as stated in N. L. R. B. v. Marshall Car Wheel & Foundry Co., 5 Cir., 1955, 218 F.2d 409, 414, is as follows:

"Where * * * misconduct is clearly shown, condonation may not be lightly presumed from mere silence or equivocal statements, but must clearly appear from some positive act by an employer indicating forgiveness and an intention of treating the guilty employees as if their misconduct had not occurred. We think respondent correctly asserts that the essential elements of condonation, i. e. forgiveness and the resumption of the former relationship between the strikers and respondent, are patently lacking here. * * * "

The necessary elements under the doctrine of condonation are entirely lacking in this case.

■ We recognize the power of the Board to draw reasonable inferences from evidential facts but a thorough study of the record fails to reveal substantial evidence of any kind or degree to support a finding that petitioners condoned the actions of the strikers herein. There is no evidence whatever of a positive act by the petitioners to indicate either a foregiveness of the strikers or an intention to resume their former relationship with them. We are of the belief that the Board on this phase of the case, not only overlooked or misconceived the test laid down in Marshall Car Wheel & Foundry Co., supra, but misapprehended and grossly misapplied the standard for determining substantial evidence. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Pittsburgh Steamship Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479; Radio Officers' Union, etc. v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455.

With regard to the second holding of the Board, that of violation by petitioners of Section 8(a) (3) of the Act, there is not a scintilla of proof in the record in support thereof. This Court, in N. L. R. B. v. Adkins Transfer Co., 6 Cir., 1955, 226 F.2d 324, 327, set forth the criteria necessary to establish a violation of this section as follows:

"In order to establish an 8(a) (3) violation, there must be evidence that the employer's act encouraged or discouraged union membership. The section requires that the discrimination in regard to tenure of employment have both the purpose and effect of discouraging union membership, and to make out a case, it must appear that the employer has, by discrimination, encouraged or discouraged membership in a labor organization."

As noted, the case at bar is barren of any such evidence. To the contrary, the undisputed facts reflect that the opposite is true. There was an election, a certification by the Board and a contract which, at the time this controversy arose, was being recognized. No one of the group of strikers testified that his union membership had anything to do with his being discharged. The Court is unable, in the light of this record, to sustain the Board's action on this phase of the case. Certainly, there is no evidence of any kind to support an inference of a Section 8(a) (3) violation. The petitioners' discharge and refusal to reinstate the strikers, in the circumstances of this case, could not, under any stretch of the imagination, be considered an unfair labor practice under the latter section of the Act. N. L. R. B. v. Draper Corp., supra.

Finally, it should be said we find nothing in the record to support the Board's insistence that the strike herein was for the purpose of protecting individual and group grievances under Section 9(a) of the Act (29 U.S.C.A. § 159). To follow this insistence of the Board, in the light of the facts, would be to hold that a minority group may lawfully strike whenever a grievance is decided in a manner which does not satisfy such minority group.

Since the employees engaged in the strike herein were not protected from discharge and there was no condonation by the employer, their reinstatement was not required, and, therefore, there is no basis for a finding of an unfair labor practice on the part of the petitioners

with respect to the discharge and refusal to reinstate or for order awarding reimbursement of pay.

The order of the National Labor Relations Board is denied enforcement and is set aside in its entirety.