NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TENNESSEE CONSOLIDATED COAL COMPANY and Grundy Mining Company, Respondents.

No. 14705.

United States Court of Appeals Sixth Circuit.

Aug. 22, 1962.

Jules H. Gordon, N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Judson Harwood, Nashville, Tenn., for respondents.

Before McALLISTER, Circuit Judge, and BOYD and THORNTON, District Judges.

THORNTON, District Judge.

The National Labor Relations Board found that respondents violated Section 8 (a) (2) and (1), Section 158(a) (2), Title 29 U.S.C.A., of the National Labor Relations Act and issued its Decision and Order containing cease and desist instructions as well as instructions to post the usual notices. We have before us the Board's petition for enforcement. The violation is based on the finding by the Board that employees were required as a condition of employment to execute membership and checkoff cards.

The controversy arises as a result of the closing of the mines operated by Tennessee Consolidated Coal Company, herein called Consolidated, on March 15, 1960, that being the date of the expiration of the contract between the United Mine Workers and Consolidated. The mines were closed because the parties were unable to successfully negotiate a new contract. Thereafter Grundy Mining Company, hereinafter called Grundy, was formed as a wholly owned subsidiary of Consolidated. Grundy leased from Consolidated certain of its mines to perform mining operations. In turn Consolidated agreed to sell all coal produced by Grundy. Consolidated's counsel, Judson Harwood, became president of Grundy. Thereafter Harwood contacted counsel for Southern Labor Union, a local labor organization, concerning the need for a labor supply for the Grundy Mining operation. The efforts of Harwood to obtain about 40 miners to work the Grundy mining interests resulted in a charge by the Board that Grundy gave unlawful assistance to Southern Labor Union (1) by requiring job applicants to sign Southern authorization and dues checkoff cards before being hired and (2) by threatening use of economic pressure upon operator-lessees of certain mining properties owned by Consolidated if they did not likewise employ members of Southern Labor Union in their operations.[1]

The Board in its Decision and Order, affirming the Trial Examiner on his finding that respondents required job applicants to sign Southern authorization and dues checkoff cards before being hired, made certain "additions and modifications" including the following:

"When Campbell ran out of cards, he advised the men that they could sign up on Monday morning, August 15, when work was scheduled to begin. On Monday, Cain, Campbell and Fults drove out to the Grundy site, where they met superintendent

---

[1] The Board modified the findings of the Trial Examiner by finding that the complained-of conduct of the respondents, involving statements by an employer to other employers which were never communicated to any employees, and never effectuated by any action on the part of the respondents or the operator-lessees, did not violate the provisions of the Act under these particular circumstances and therefore the Board dismissed those portions of the complaint that referred to this particular activity.

Gibbs.[2] Upon learning that some men who had not yet signed cards had lost their way en route to the mine location, Cain, Campbell, Fults, and Gibbs went out and found these men and signed them up for Southern, with Cain handing the cards to Gibbs, who secured the signatures and kept the cards. About 18 men presented themselves for work on August 15 and/or 16, all of whom had been told to report by Campbell, and all of whom were paid for the 1 or 2 days they reported, although operations never began due to the mob action of UMW members.

"The Respondents contend that the conduct described above did not constitute a violation of the Act because (1) Campbell did not condition employment on the execution of Southern cards; and (2) Campbell was not their agent but was merely 'birddogging,' that is, scouting for prospective employees. We find no merit in these contentions. We infer and find from the fact that Campbell simultaneously solicited for hire and for the execution of Southern cards, asking the men whether they wanted to 'sign the cards and go to work,' that he thereby indicated to the prospective employees that the execution of these cards was a condition of employment. In addition, Gibbs, the superintendent, not only knew of Campbell's conduct but actually participated in securing signatures on Southern cards on the morning that work was scheduled to commence.

"Further, all the individuals hired by Campbell were compensated by the Respondents for the 1 or 2 days on which they appeared for work, even though no work was actually done, thus confirming Campbell's authority to hire. Accordingly, we find that Campbell conditioned hire for jobs with the Respondents on the execution of Southern cards, and that the Respondents participated in, adopted and ratified Campbell's activities, thereby rendering assistance to Southern in violation of Section 8(a) (2) and (1) of the Act."

The determination to be made here is whether there is substantial evidence in the record to support the conclusion of the Board that respondents required employees, or prospective employees, as a condition of employment with Grundy to execute union membership and dues checkoff authorization cards. This constitutes the basis for the Board's conclusion that respondents illegally assisted Southern Labor Union in violation of the Act.

The relevant provisions of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq.) are as follows:

"RIGHTS OF EMPLOYEES

"Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)."

"UNFAIR LABOR PRACTICES

"Sec. 8(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

"(2) to dominate or interfere with the formation or administration of any labor organization or

---

2. It was stipulated at the hearing that Paul Gibbs was hired in a supervisory capaci-ty for Grundy Mining Company by the president, Judson Harwood.

contribute financial or other support to it; * * *."

A review of the testimony of the witnesses produced by the General Counsel, in support of the claims of the Board, fails to disclose any testimony, direct or inferential, that "Respondents Consolidated and Grundy interfered with the administration of Southern Labor Union by contributing support to it, and thereby interfered with, restrained, and coerced employees, and prospective employees, in the exercise of rights guaranteed by the Act," as found by the Trial Examiner. Such a review of the testimony also fails to disclose either directly or inferentially "that the Respondents participated in, adopted and ratified Campbell's activities, thereby rendering assistance to Southern in violation of Section 8(a) (2) and (1) of the Act," as found by the Board . . . there is no testimony that the respondents knew of the activities of Campbell other than what might have been known by Gibbs, the superintendent. What Gibbs knew or was told is not clear either from his testimony or from the testimony of those witnesses who contacted him during the period that the labor force was being recruited for employment in the Grundy operation. Gibbs, as superintendent of the Grundy mining operations, took a passive part in the efforts of others to recruit labor. This was evidenced by his testimony that "I just told them that if they could find some good men that wanted to go to work, regardless of whose Union they belonged to, that was what I was advised to do . . . put them to work." The Board further concluded that "all the individuals hired by Campbell were compensated by the Respondents for the 1 or 2 days on which they appeared for work, even though no work was actually done, thus confirming Campbell's authority to hire." We must differ with the Board that this confirms "Campbell's authority to hire." These men were not paid for working. They were paid "for showing up for work." What might have been necessary to process them for actual work, under less turbulent conditions, has not been established by the testimony of any witness other than Harwood. He testified to the effect that if potential employees were located by the Union representative, then he was to send them to a representative of respondents (not at that time designated) for the furnishing of necessary information before they would be put on the payroll, and that they would be hired if, in the opinion of the respondent, they were qualified. In addition to this, there is the following testimony of Campbell who has been identified as the chief recruiter of the labor force for the Grundy mine:

"Q. Now you understood that your job was to round up these people if they wanted to work?

"A. Yes, sir.

"Q. And bring them down there to him Monday morning?

"A. Yes, sir.

"Q. And that he (Gibbs) would hire them when they got there?

"A. Yes, sir.

"Q. Now he didn't tell you to tell these people that they had to sign a Southern Labor card before he would hire them; did he?

"A. No. He didn't say that they would have to sign a Southern Labor Card.

"Q. You didn't tell the men that they had to sign a Southern Labor Card?

"A. No, sir.

"Q. You knew that the Southern Labor Union was responsible for trying to find these men; at least, they were assisting in finding the men?

"A. Yes, sir."

The testimony established that Harwood, as president of Grundy, needed about 40 men to work the mine of his company, that he examined the contract executed by Southern Labor Union with another mining company and concluded that his company could "live under" such a contract. He accordingly located the attorney for Southern Labor Union and

informed him that Grundy Mining Company was seeking employees who were willing to work at a wage rate of $20.12 a day. This attorney gave Harwood the name of one Johnny Cain and further informed Harwood as follows: "I will send Mr. Cain down into that field, where we already have a local, and see if he can find you some men that are willing to work" whereupon Harwood stated that "if he located the people, that he was to send them to the individual that I would later tell him. I didn't know at that time . . . for procuring necessary information before they could be put on the payroll, and that we would hire them if in our opinion they were qualified. That was the only limitation I placed on it."

Neither the attorney contacted by Harwood nor Johnny Cain (identified as a field representative for Southern Labor Union) was produced as a witness by the General Counsel although Cain was the party who enlisted the services of Campbell in attempting to recruit a group of 40 men for possible employment at the Grundy mining operation. It has been further established that Campbell accepted this assignment and got some of the men to sign up before he ever saw or contacted any representative of the respondents, including Gibbs. The foregoing arrangement for the recruiting of these men provides no basis for concluding that Campbell was acting under any instructions from the respondents, or any representative of the respondents, to the effect that membership in the Southern Labor Union was a requisite to obtain employment with Grundy. We have just noted that two persons whose testimony might shed some light on this were not witnesses—Cain and the attorney contacted by Harwood.

In determining whether there is substantial evidence from the record as a whole to support a finding that respondents required employees, or prospective employees, as a condition of employment to execute membership in Southern Labor Union and dues checkoff authorization cards we refer to the definition given by Mr. Justice Holmes in Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 and reiterated by Mr. Justice Frankfurter in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456: "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Mr. Justice Frankfurter has further said in Universal Camera, at page 488, 71 S. Ct. at page 464: "Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." See also Plasti-Line, Incorporated v. National Labor Relations Board, 6 cir., 278 F.2d 482, 487 decided by this Court wherein we cited Universal Camera with reference to the standard for determining substantial evidence.

The facts as they emerge from the not-always-too-coherent testimony furnish no more reasonable basis for determining that respondents required employees, or prospective employees, as a condition of employment to execute union membership and dues checkoff authorization cards than they do for determining that Cain, as field representative of Southern Labor Union, on his own initiative, and assisted by his union associates as the actual solicitors, took advantage of an opportunity to increase the membership of Southern Labor Union.

We conclude that there is a lack of substantial evidence in the record as a whole to support the Board's order. Therefore its enforcement is hereby denied.