NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

R. C. CAN COMPANY, Respondent.

No. 20609.

United States Court of Appeals Fifth Circuit.

March 11, 1964.

Rehearing Denied May 5, 1964.

Gewin, Circuit Judge, dissented.

---

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick Manoli, Associate Gen. Counsel, Melvin Pollack, Atty., Arnold Ordman, Gen. Counsel, Joseph C. Thackery, Atty., N. L. R. B., Washington, D. C., for petitioner.

Karl H. Mueller, Harold E. Mueller, Mueller & Mueller, Fort Worth, Tex., for respondent.

Before TUTTLE, Chief Judge, and BROWN and GEWIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case presents problems arising out of a quickie strike participated in by only a few employees and over almost as soon as it started. The Board seeks enforcement of its Order determining that the strike was protected activity and that the failure of the Employer to reinstate the strikers to their prior and unfilled jobs violated § 8(a) (3) and (1) of

the Act. 29 U.S.C.A. § 158(a) (3) and (1). The Order also calls for back pay during the two weeks' suspension. We enforce.

The Employer [1] is engaged in the manufacture of cans and metal containers for the food industry and primarily for the packaging of frozen bakery products. Some eight months before this occurrence on Wednesday, January 31, 1962, the Union [2] had been certified as the bargaining representative of the production and related employees who numbered approximately 50.

Bargaining negotiations had been going on for some time, but not with much success. One of the problems seems to have been the difficulty of agreeing on a time acceptable and convenient to both parties for bargaining sessions. The employees were very restive about this difficulty and the consequent inability to get anywhere in actual bargaining. The Union representative Lee, in collaboration wtih the 3-man negotiating committee,[3] called a Union meeting for the evening of Tuesday, January 30. The leaflet, distributed to all employees, briefly describing the lack of progress and ending with the urgent plea, "come to the meeting Tuesday and let us reason together", pinpointed the grievance in these words:

"The company will not meet with us unless they have their well-paid attorney with them and the result is meetings have been held only at the convenience of the attorney."

At the meeting on Tuesday, January 30, Lee outlined the "difficulty [we] had had in getting meetings to negotiate [an] agreement." He reported that although the Union had "made many concessions," they had not yet been able to get agreement. It was Lee's opinion that the Employer was "not actually interested in reaching an agreement." As

1. R. C. Can Company.

2. United Steelworkers of America, AFL-CIO. No local union was formed. The Union representative was J. A. Lee, an employee of the International.

3. Of the three, Scott, its chairman, instigated the walkout strike and was joined by member Brewer. The third member, Huffman, was on a different shift.

was true of previous Union meetings, there was talk of a strike, but Lee "recommended against the strike," and the general consensus seemed to be that "there wouldn't be a walkout at that time." No strike vote was taken, however, nor were any plans made for a walkout, strike, or similar action on the part of the organization.

On Wednesday morning, January 31, during working time on the 7:00 a. m. shift, Scott talked to Brewer and a few others about having a "meeting and see what we could work out amongst ourselves to get the company to negotiate with us." The word was spread and at the 10:00 a. m. coffee break, Scott, Brewer and six others left the plant. The Employer became aware of this activity when the plant superintendent observed the men on their way out. And while leaving, Scott told Foreman Tekell that the men "were going to try to get some pressure on the company to meet with us" and that they would probably "get [the production manager] Lloyd Smith's blood pressure up." Apparently that did not happen as such, but Smith was soon advised that the plant superintendent "thought some of the boys were walking off the job."

Just what was in their mind does not appear. It is plain, however, that they did not intend to return to their work stations at the end of the coffee break. The group went to a bowling alley some distance away, and there had a discussion while having coffee. After about a thirty-minute discussion on generally what could be done to get the Employer to meet more often and "get this contract settled," the eight men returned to the plant at about 11:00 a. m. where they picketed two principal entrances displaying crude signs reading "On Strike." Scott had called Lee to tell him what had happened and asked him to "come out." On his arrival at the plant shortly thereafter, Lee told Scott that he wished that the group had not walked out. He did state, however, that their activity was "protected" and he thought that the men should offer to return to work "uncondi-

tionally." The men were at first opposed to this suggestion, but after further conferences with Lee, they agreed that the picket line would be withdrawn. The understanding was, however, that this would be done shortly after 3:30 p. m. at which time the second shift would commence, and they would wait a few minutes thereafter to inform the Employer of their decision. Pursuing this understanding, the picket line was withdrawn at about 3:30, and at about 3:45 p. m. the negotiating committee informed production manager Smith that the eight employees "would like to come back to work." To this Smith replied that the men were "under investigation" and that he would notify them when to return to work. In response to their efforts to work on the 7:00 a. m. shift the following morning, Thursday, February 1, a foreman reiterated that they were still "under investigation." And later that day, in response to Lee's telephone request to reinstate the eight men, production manager Smith reaffirmed that they were "under investigation." On February 1 unconditional letters of application were sent. The group next called on Smith on the following Monday, February 5, to reaffirm that they were "ready to work." After some discussion about statements made by Scott in his application for Texas unemployment compensation insurance, Smith remarked that the men were still under investigation. The Employer by letter of February 12, 1962, offered these employees work effective February 19.

In the meantime, the Employer had to reckon with the fact of the strike. On learning of the picket line, production manager Smith conferred with the Employer's labor counsel. This discussion seemed to be concerned primarily with the operational ability to man the plant with the remaining labor force not on strike. We may assume that counsel advised that if the plant could be manned, the Employer was legally justified in following such a course. Steps were taken to carry on production. Essentially this was to be done by suspending

the second shift as of Thursday, February 1 (3:30 p. m. to 12:00 midnight) and assigning such personnel to the day shift. As this plan—although admittedly conceived to meet the strike—was actually continued until February 18, just before the men were called back to work, it is necessary to examine some of the evidentiary detail to determine whether this constituted a discriminatory refusal to reinstate to former and unfilled jobs.

The Employer had two principal production lines. One was the 2″ biscuit can, the other the 2¼″ roll line. For some time prior to Friday, January 26, the Employer had operated on a single one-shift basis during daylight hours, but running both of these lines. As an excessive inventory of 2¼″ stock had built up, the 2¼″ line was shut down at the close of work Friday, January 26. This would, of course, throw these operators out of work. Consequently, the Employer, following its general practice of trying to find substitute work for its regular employees as inventories fluctuated, simultaneously scheduled a second shift on the 2″ biscuit line to begin Monday, January 29 (3:30 p. m. to 12:00 midnight). In this way employees who had been working on the 2¼″ line were assigned to other jobs. The result would be that the 2″ biscuit line would operate on two shifts. It seems rather clear that the second shift on the 2″ biscuit line was not then required to obtain increased production.[4] But it seems plain that when the Employer on Friday, January 26, established the two-shift production schedule to commence Monday, January 29, it must have assumed that production of the 2″ biscuit cans would be substantially doubled. When the strike hit, the decision was made to termi-

nate the second shift as of the next day, Thursday, February 1. The personnel assigned to the second shift would then be transferred to the day shift to fill the places of those on strike. Since the strike was still apparently going on at 3:30 p. m., Wednesday, January 31, the management instructed those workers on the second shift to report the following morning, Thursday, February 1, for the day shift at 7:00 a. m. This they did. No new or additional production employees were hired between January 31, 1962, and February 18, 1962. The single day shift during the period January 31–February 18, 1962, produced all of the 2″ biscuit cans that the Employer desired or needed.[5] With increase in orders and decrease in inventory from intervening shipments, resumption of production of the 2¼″ line became necessary. To fill the demand for labor thus needed, the Employer sent its letter of February 12 calling the men back for work on Monday, February 19.[6]

Although this is almost always a close question, we conclude that the walkout and momentary picket line was protected activity on the part of these employees. It must be recognized, of course, that in seeking to effectuate the aim of the Act—industrial peace—competing policies are at work. Since the employer is required to bargain with the representatives of the worker, it must have some assurance, first, as to the identity of that agent. More important, however, it must be able to deal with that agent as the responsible spokesman for the employees of the unit. There cannot be bargaining in any real sense if the employer has to deal with individuals or splinter groups. And just as

---

4. The normal, desired, stock of 2″ biscuit cans was between 850,000 and 1,000,000. On January 31, it is undisputed that stock was 1,376,008.

5. In addition to rescheduling the second shift to the day shift, the Employer attained the necessary production force by adding to the duties of a leadman, transferring an office girl and a factory hand into the shipping department, and working

approximately six hours overtime. Supervisors had to "help out" but this appears to have been a customary practice whenever occasion required it.

6. As of February 19, 1962, the inventories were:

| Item | Quantity |
| --- | --- |
| 2″ biscuit cans | 944,604 |
| 2¼″ roll cans | 428,676 |

attempted negotiation with such groups or individuals would make a mockery out of bargaining, so, too, must bargaining negotiations by a single agency be kept free from divisive pressures generated by dissident elements. On the other hand, a union is, or at least should be, a democratic device. The very reason for its existence is the existence of its members and others for whom the law says it acts. Consequently, the law should be slow to declare that members cannot speak effectively in behalf of their own organization and the aims and objectives which it collectively seeks to assert in their behalf. In these conflicting policies, there may be found a basis for resolution: is the action of the individuals or a small group in criticism of, or opposition to, the policies and actions theretofore taken by the organization? Or, to the contrary, is it more nearly in support of the things which the union is trying to accomplish? If it is the former, then such divisive, dissident action is not protected. N. L. R. B. v. Draper Corp., 4 Cir., 1944, 145 F.2d 199, 156 A.L.R. 989; Harnischfeger Corp. v. N. L. R. B., 7 Cir., 1953, 207 F.2d 575; Plasti-Line, Inc. v. N. L. R. B., 6 Cir., 1960, 278 F.2d 482. If, on the other hand, it seeks to generate support for and an acceptance of the demands put forth by the union, it is protected so long, of course, as the means used do not involve a disagreement with, repudiation or criticism of, a policy or decision previously taken by the union such as, for example, a no strike pledge, a cooling off period, or the like during negotiation. Western Contracting Corp. v. N. L. R. B., 10 Cir., 1963, 322 F.2d 893.[7]

Viewed in this light, we find supportable the Board's factual conclusion that this was concerted activity within the protection of the Act. There was no real difference between what these men were after and what the Union sought. The Union, as witness the hand bill and the meeting called for that purpose, was trying to get the Employer to sit down and talk. That, too, was the aim of these men. Although it is true that at the Union meeting there was no vote to strike, it is equally true there was no formal vote not to strike. In any event, the consensus that the Union would not strike at the present time was not communicated to the Employer. In no sense could it have affected the Employer's response to the picket line. And one thing seems quite clear. The moment Lee learned of the action, he expressed a disappointment that the men had taken it. But in no way did he repudiate it. To the contrary, he told the men their action was protected, a position immediately corroborated by assisting in the preparation of the letters of unconditional application plus the telephone calls to production manager Smith. To cap it all, there is not a single stitch of evidence to indicate that this action put the Employer in any sort of quandary. It was not put in the position of choosing between the demands of the Union and the demands of these strikers. Whether protected or unprotected, the Employer regarded the action as an economic strike by some of its employees. And its reflex was simply to prepare for battle.

This brings us to the question of the Board's order finding violation of § 8(a) (1) and (3) and the back pay provision during the period of non-employment. Since the men were engaged in protected activity, all recognize that they enjoyed rights equivalent to economic strikers. Thus, none could compel the Employer to discharge a person hired to serve as a replacement during the strike. On the other hand, if the

---

7. As the dissent in that case points up, the decision cannot really rest on the fact that ultimately a majority of the union members voted expressly to support the quickie sit-down because this was precipitated by minority action. See also the dissent of Judge Swygert in N. L. R. B. v. Sunbeam Lighting Co., 7 Cir., 1963, 318 F.2d 661, at 665, in which he expressly rejects the thesis of the two separate concurring opinions that the matter is to be determined by the presence or absence of a majority of the union members in any such conduct.

job position had not been filled by a replacement, the economic striker was entitled to be reinstated to his former job without discrimination for having participated in the strike. Reinstatement would also be subject to the general principle, most frequently applied in the case of established discrimination but equally applicable where none is found. This principle recognizes that if, since the time of the protected activity, conditions have actually changed so that the particular job has been abolished, an employer need not create a new job or revive the old. In that situation the remedy has to be adapted to such economic-business conditions.[8]

The Employer here attacks the Board's order, first, by challenging the existence of the requisite discriminatory motive and, second, by asserting that there was no work and hence no jobs until inventory conditions required increased production at which time the men were put back to work.

In support of the first, the Employer argues with considerable basis that when the strike was precipitated by this small group, there was, at best, doubt as to its protected or nonprotected status. Consequently, it was entitled to make an investigation on which to base its inclusion and thereafter pattern its conduct accordingly. We can assume that it was entitled to investigate. Cf. N. L. R. B. v. Dan River Mills, 5 Cir., 1960, 274 F.2d 381, at 388; N. L. R. B. v. Minute Maid Corp., 5 Cir., 1960, 283 F.2d 705, 710; Hendrix Mfg. Co. v. N. L. R. B., 5 Cir., 1963, 321 F.2d 100, 105. Obviously, this would take time. Had an investigation really been made and on it a conclusion reached, we could further assume for the purposes of this case that for the intervening period of time required to make the investigation, no back pay could be ordered. And, at least for the purposes

of this problem we could assume that no back pay would be due if the Employer's decision, held and determined in good faith, turned out actually to have been unfounded. Cf. Rubin Bros. Footwear, Inc. v. N. L. R. B., 5 Cir., 1953, 203 F.2d 486; N. L. R. B. v. Burnup & Sims, Inc., 5 Cir., 1963, 322 F.2d 57, cert. granted, 1964, 375 U.S. 983, 84 S.Ct. 518, 11 L.Ed. 2d 472.

■ But these propositions and assumptions are here unavailing. The record amply supports the Board's finding, express or implied, rejecting the claim that reinstatement was deferred pending investigation. The simple fact is that there is no proof that any such investigation was made, or that such investigation or its conclusion brought about either the 2½ weeks' suspension or the Employer's notice of re-employment as of February 19. It is true, of course, that production manager Smith told the men late that afternoon that their re-employment would have to await an "investigation," a statement repeated to them the following morning and later, to Lee on his telephone inquiry. Likewise, on February 5, when a committee called on Smith about reinstatement, he again deferred decision pending the "investigation."[9] But if an investigation ever was made, there is no proof at all either as to what was done or what was looked for. Smith's recollection was a virtual blank, and the Company's lawyer, who legitimately suggested an investigation, did not supply the missing link when, voluntarily relinquishing any professional privilege, he took the witness stand to offer testimony as to certain activities during bargaining. Perhaps more important, the re-employment of the men resulted, not from the investigation or its conclusion, but rather from the need for increased production.

---

8. N. L. R. B. v. American Aggregate Co., 5 Cir., 1962, 305 F.2d 559, 563–565; N. L. R. B. v. American Steel Bldg. Co., 5 Cir., 1960, 278 F.2d 480, 482; N. L. R. B. v. Biscayne Television Corp., 5 Cir., 1961, 289 F.2d 338, 340.

9. As to Scott, Smith's remarks indicated that their investigation was complete on receipt of the unemployment compensation application showing that Scott "had quit" in a labor dispute.

■ The Employer's claim of a right to investigate has unusual significance under these circumstances. For what is put forward as a justification either for failing to re-employ or delay in re-employment turns out to be nonexistent. Although the Employer, strictly speaking, had no burden of going forward to justify its conduct, cf. N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, when it sought to do so and the ground turned out to be unestablished, the Board was certainly entitled to regard this as a significant element on the crucial question of discriminatory motivation.

■ The other justification urged for the delay in rehiring was the asserted lack of work for the strikers seeking re-employment. Ordinarily the question of whether there were jobs still open to be refilled or work to do would relate only to the problem of the remedy, e. g., reinstatement, back pay, or the like. Here, however, it serves a dual purpose bearing on motivation as well as remedy.

In analyzing this aspect of the case, we reject one theory emphasized by the Board. It runs this way. The strike terminated at least by 3:45 p. m. on Wednesday, January 31. This was, of course prior to 7:00 a. m., February 1, at which time the former afternoon shift, reshuffled to meet the strike, was to go on duty. Therefore, failure of the Employer to assign the normal shifts, day and afternoon, on February 1 was so unreasonable as to itself prove punitive anti-union motive. But this, as is often the case, is here too equivocal on which to base the crucial finding. N. L. R. B. v. Citizens Hotel Company, 5 Cir., 1964, 326 F.2d 501.

We think the element of reasonableness or unreasonableness is completely immaterial here. What was done, viewed in the light of the Employer's general practice and, more important, its purpose just prior to the strike, affords ample basis for the Board's 8(a) (1) and (3) conclusion.

The Employer's regular practice was a benevolent and generous one. When production declined, it tried to find other work and jobs to which its regular employees could be assigned. Frequently this took the form of maintenance work, painting, cleaning up the plant, etc. On this occasion, the share-the-work policy was applied by the decision announced Friday, January 26, to institute on the following Monday, January 29, the afternoon shift to alleviate in substantial part the decision to suspend production on the 2¼″ roll line. This plan was actually put into effect on Monday, January 29, by eliminating the 2¼″ roll line on the first shift and the addition of an afternoon shift for the 2″ biscuit line.

Then the strike hit. It was too late to make changes for the afternoon shift so it went on as scheduled. But management, faced with the reality of the strike, some time prior to 3:45 p. m. that afternoon made the decision to discontinue the newly instituted afternoon shift and assign such workers to the day shift commencing the following morning, February 1. Of course by the following morning, February 1, the strike was over and all knew it. Shortly the strikers asked for reinstatement.[10]

Why were the men not reinstated? The Employer answers, first, that an investigation was being made, a reason which might have been adequate had the inquiry actually gone on to final decision in good faith. Second, and now more critical, the Employer answers: the men were not re-employed because there was no work. In support of this second answer, the Employer makes a formidable showing which we can fully credit concerning its current inventories on both the 2″ and 2¼″ products. We can accept also the Employer's proposed conclusion that there was no real need for the production which these strikers would have achieved had they been re-employed. But the simple fact is that this did not represent any change of condition. This

10. The Board, with ample basis, fixed the reinstatement application as to employee Gerald Williams as February 8, 1962.

situation was exactly the same as it was the morning before when the men went out on the ill-timed, ill-starred strike.[11] It is true, of course, that the added production from these men was not needed. Neither was it on Wednesday. Nevertheless the Employer had for its own good reasons, benevolent or otherwise, made the decision for production to go forward on two shifts. There was only one new factor: the strike. Had not the strike taken place, each of these men would have been working on Thursday, February 1. Had they been working, they would have been producing articles which the Employer's evidence shows quite strongly were not needed. The only reason, therefore, that these men were not working is that they had gone out on strike.[12]

Whatever might have been the subjective motives of the Employer, it is now clear that an employer may not visit this sort of consequence upon employees who engage in rights protected by the Act. If this conduct is not interference with, restraint, or coercion of employees in the exercise of rights guaranteed by § 7, 29 U.S.C.A. § 157, constituting a violation of § 8(a) (1), then most assuredly it is conduct condemned by § 8(a) (3). The element of anti-union discriminatory motive essential to § 8(a) (3) is sufficiently present when, as it must be, the conduct is judged objectively, not subjectively, in terms of the likely consequences under the facts of this specific setting. N. L. R. B. v. W. L. Rives Co., 5 Cir., 1961, 288 F.2d 511, at 516; and also N. L. R. B. v. Dalton Brick & Tile Corp., 5 Cir., 1962, 301 F.2d 886, at 895–897, discussing at length Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N. L. R. B., 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11; Radio Officers Union of Commercial Telegraphers Union, AFL v. N. L. R. B., 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455. Neither of the two reasons put forward by the Employer—(1) investigation, (2) no-work—turns out to be well founded as the cause for failure to reinstate. The only change in circumstance resulting in employment versus non-employment is the fact of the intervening momentary strike. The Board was, therefore, eminently justified in its conclusion that, viewed objectively, this was discrimination (a) precipitated because of protected activity, and (b) obviously having a discouraging effect on union membership. Reaching that conclusion, the Board was also entitled to order back pay during the short period of suspension. N. L. R. B. v. Holcombe, 5 Cir., 1963, 325 F.2d 508. That the result might well have been different[13] had there been an actual change in economic business conditions resulting in no work, the abolition of a particular job, or the like, does not help the Employer here. There was change, to be sure. But the change was the strike, its commencement and its termination. And that was not enough.

Order enforced.

GEWIN, Circuit Judge (dissenting).

I.

My basic disagreement with the majority arises from its holding that the activity of the 8 men was "protected." I have much difficulty in seeing how such activity on the part of 8 men can be said to represent the policies of a union of approximately 50 men when in a meeting

---

11. There was, of course, the production of the first shift on Wednesday, January 31, interrupted as it was by the strike, plus that of the afternoon shift. But there is no evidence whatsoever to indicate either what that was in terms of 2″ biscuit cans, or that management considered this one-day addition of any significance.

12. The substitute employees were not really "replacements." They were regular employees who, had there been no strike, would have been working for the Employer doing substantially the identical or related work. In addition some clerical office workers were shifted to production though their regular jobs were not abolished or filled by others.

13. See, e. g., the cases cited in note 8, supra.

the very night before, the legal representative of the union had discouraged talk of a strike, and advised the members that everything possible should be done before resorting to a walkout. Although no vote was taken in the meeting on whether to strike, the testimony indicates that it was generally understood that there would be no strike. Indeed, when the 8 walked out, their purpose was simply to meet and confer. Apparently, the decision to strike was made at the bowling alley. This decision was unauthorized and was in direct conflict with the conclusion reached by the Union in the meeting held the night before. When Lee, the union representative with whom the Company was bound to deal, heard of the strike, he immediately instructed the men to return to work. They refused. The majority states that if the action of the individual is in opposition to the prior action of the Union, it is then divisive, dissident action and hence not protected. Not only was the action taken by the 8 here in direct opposition to the action taken by the Union the very night before, it continued to be in direct opposition to the position taken by the Union when the representative instructed them to return to work immediately, and they refused. The majority concludes that the activity is protected so long as it seeks to generate support for demands already made by the Union, unless such action involves a disagreement with a policy or decision previously adopted by the Union. Yet, somehow the majority does not see the walkout here as a disagreement with the Union's activities of the night before simply because " * * * there was no formal vote not to strike."

The majority concedes that the general consensus of the opinion of the union members at the meeting was "that the Union would not strike at the present time * * *," but goes on to hold that the walkout was nevertheless protected activity because the Company did not know that the Union had failed to decide to strike. This line of reasoning leads to an absurd result. In such circumstances an employer would be bound to negotiate with any individual or group, however small, unless the employer had full knowledge of decisions made at union meetings, and indulged the presumption that new representatives had been chosen to take the places of representatives with whom such employer had previously negotiated. The employer is bound by § 9 (a) of the Act to negotiate with the legally constituted representative of the Union and no one else. The Supreme Court stated in Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 832, 88 L.Ed. 1007, 1011:

"For in either case, as will presently appear, we think that the negotiations by petitioner for wage increases with anyone other than the union, the designated representative of the employees, was an unfair labor practice. * * * The National Labor Relations Act makes it the duty of the employer to bargain collectively with the chosen representatives of his employees. The obligation being exclusive, see § 9(a) of the Act, 29 U.S.C.A. § 159(a) [9 F.C.A. Tit. 29, § 159(a)], it exacts 'the negative duty to treat with no other'."

There are numerous cases from other Circuits directly in point and which should be controlling in this case. A short discussion of two of them will suffice to show the fallacy of the majority opinion. In N. L. R. B. v. Draper Corp., 4 Cir. 1944, 145 F.2d 199, 156 A.L.R. 989, 25 per cent of the total working force of the employer in question walked out because "they considered that the company was 'stalling' and that they wanted 'action' and would get it." The strikers were fired and a complaint was filed with the Labor Board. The Board held the action to be protected. The Fourth Circuit reversed stating:

" * * * The purpose of the act was not to guarantee to employees the right to do as they please but to guarantee to them the right of collective bargaining for the purpose of preserving industrial peace. The

policy of the act is thus set forth, 29 U.S.C.A. § 151: 'The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce. * * * It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.'

"It is perfectly clear not only that the 'wild cat' strike is a particularly harmful and demoralizing form of industrial strife and unrest, the necessary effect of which is to burden and obstruct commerce, but also that it is necessarily destructive of that collective bargaining which it is the purpose of the act to promote. Even though the majority of the employees in an industry may have selected their bargaining agent and the agent may have been recognized by the employer, there can be no effective bargaining if small groups of employees are at liberty to ignore the bargaining agency thus set up, take particular matters into their own hands and deal independently with the employer. The whole purpose of the act is to give to the employees as a whole, through action of a majority, the right to bargain with the employer with respect to such matters as wages, hours and conditions of work. Section 9 of the act, 29 U.S.C.A. § 159, provides: 'Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the *exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment:* Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer.'

(Italics supplied)

"A union selected as bargaining agent is thus made the exclusive representative of all the employees for the purpose of collective bargaining. As said in Virginian R. Co. v. System Federation, 300 U.S. 515, 548, 57 S.Ct. 592, 600, 81 L.Ed. 789, the law 'imposes the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other.' See also McQuay-Norris Mfg. Co. v. N.L.R.B., 7 Cir., 116 F.2d 748; Texarkana Bus Co. v. N.L.R.B., 8 Cir., 119 F.2d 480, 484; North Electric Mfg. Co. v. N.L.R.B., 6 Cir., 123 F.2d 887, 890. The employees must act through the voice of the majority or the bargaining agent chosen by the majority. Minority groups must acquiesce in the action of the majority and the bargaining agent they have chosen; and, just as a minority has no right to enter into separate bargaining arrangements with the employer, so it has no right to take independent action to interfere with the course of bargaining which is being carried on by the duly authorized bargaining agent chosen by the majority. The proviso to section 9 above quoted, preserving to individuals or groups of employees the right to present grievances to the employer, negatives by necessary inference the right on their part to call strikes for the purpose of influencing the bargaining being carried on

by the chosen representatives of all the employees."

The Sixth Circuit in Plasti-Line, Inc. v. N.L.R.B., 6 Cir. 1960, 278 F.2d 482, a case very similar to the present case, followed Draper and held:

" * * * Thus, the Union had taken its position on these matters and the striking group responded to this position with the strike in direct defiance of the purpose of the Act under which they now seek redress. Their action eliminated all doubt but that the strikers were dissatisfied with the settlements reached by their representative and with the orderly disposition of the grievances by it.

"True, certain seniority rights of the striking group were affected, but petitioners were not empowered to change or alter the situation by dealing with this minority group concerning these matters. To have done so would have resulted in a violation of the petitioners' obligations to the certified bargaining representative under the contract and also a violation of Section 8(a) (5) of the Act. Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007."

*    *    *    *    *    *

"The Act is based upon the principle of promoting industrial peace through collective bargaining and an orderly settlement of disputes. The law imposes on the employer the positive duty to bargain with the representative of the majority of his employees and not to bargain with any other. Therefore, a minority group must acquiesce in the decisions and actions of such representative."

*    *    *    *    *    *

"Here the strike was called and carried on by an irresponsible minority, contrary to the act, the contract between the parties, and in defiance of its bargaining representative."

See also Harnischfeger Corp. v. N.L.R.B., 7 Cir. 1953, 207 F.2d 575.

At least two of the Circuits have held that walkouts are not protected unless participated in by at least over 50 per cent of the unit. In N.L.R.B. v. Sunbeam Lighting Co., 7 Cir. 1963, 318 F.2d 661, Judge Castle, citing Draper as authority, held that the walkout was not protected because the record failed to sustain the Board's finding that a majority of the workers had participated. Judge Kiley in a concurring opinion, held that the General Counsel had the burden of proving that over 50 per cent of the workers had participated, and that such burden was not met. Judge Swygert dissented on the ground that, in his opinion, the record sustained the Board's finding that "[A] *majority* of the plant's employees went on strike * * *." (emphasis added).

In a very recent case, Western Contracting Corp. v. N.L.R.B., 10 Cir. 1963, 322 F.2d 893, the 10th Circuit followed the teaching of Sunbeam and agreed with the Board that the walkout was protected because:

"But, in addition, the conduct of the employees here must be regarded as *majority* action for the following reasons: Although this conduct had its origin with the protest of the nine (of a total of eleven) day-shift drivers who constituted, it is true, a minority of the total employees, this group was joined soon after the first incident by the night-shift drivers. Finally, a majority of all of the truck drivers voted to not return to work until the heaters were installed."

*    *    *    *    *    *

"The case before us is substantially different from those which were before the respective courts in Draper, Harnischfeger and Sunbeam. Here, the strike was not by a minority of the employees."

It is also interesting to note that the dissent in Western requires majority participation before the action is protected. The dissent stated:

"The premise of the main opinion is that a *majority* of the employees

engaged in concerted activity which was not in derogation of the position taken by their bargaining agent. Could I find support in the record for such premise I would be in complete accord."

It is not contended that in every case a strike must be supported by a majority of the workers in order to constitute protected activity.[1] I do conclude under the peculiar facts of this case, i. e., the tacit rejection of a strike by the union the night before the walkout, and the agent's admonitions to the minority group to return to work immediately, all of which was ignored and disregarded by the minority, cannot be said to be protected. Indeed, it falls far short of the test laid down by the majority:

"* * * it is protected so long, of course, as the means do not involve a disagreement with, repudiation or criticism of, a policy or decision previously taken by the union * * *"

## II.

The Board found and the majority sustained a violation of § 8(a) (3) of the Act.[2] I have searched the record thoroughly and diligently, but have not found *any* evidence [3] tending to show either a purpose on the part of the employer to discourage union membership, or any conduct of the employer calculated to have the effect of discouraging union membership. So far as the record shows, all of the non-strikers were members of the same union, yet none of them was discharged. All of the strikers were put back to work as soon as production requirements would permit without the imposition of any conditions relative to union membership. The company had met and negotiated with the Union regularly for some months prior to the strike —the last meeting being only 21 days before the strike. Even if the employer's action could be justifiably construed to be retribution for or interference with the activity of the minority group of strikers, there has been no showing whatever that such conduct was for the purpose of, or had the effect of discouraging union membership. Perhaps the error of the Board is demonstrated by its finding:

"By discriminating in regard to the tenure of employment of * * * thereby discouraging memberships in *and activities on behalf of a labor organization* * * *" (emphasis added)

Such an extension of § 8(a) (3) must be made by the Congress, not the Board. Judicial approval of such an extension does not justify or strengthen it. In Draper, supra, the 4th Circuit stated:

"It is perfectly clear that, in the discharge and refusal to reemploy, there was no intent to discourage membership in any labor organiza-

1. In N. L. R. B. v. Draper Corp., supra, the court said:
"* * * We do not mean to say, of course, that a strike can be called only by a bargaining union, or that less than a majority of employees will not be protected when they go on strike in protection of their rights. See Firth Carpet Co. v. N. L. R. B., 2 Cir., 129 F.2d 633. What we do mean to say is that minorities who engage in 'wild cat' strikes, in violation of rights established by the collective bargaining statute, can find nothing in that statute which protects them from discharge. In the absence of the statute, there was nothing in the law which forbade the discharge of strikers. There is nothing in the statute, properly construed, which protects from discharge those who strike in defiance of its provisions. No surer way could be found to bring collective bargaining into general disrepute than to hold that 'wild cat' strikes are protected by the collective bargaining statute."

2. The pertinent portion of the Section is as follows:
"It shall be an unfair labor practice for an employer—* * * by discrimination * * * to encourage or discourage membership in any labor organization."

3. As was said in Sunbeam supra:
"* * * The Board's findings are entitled to respect but they are to be measured by whether or not they are supported by substantial evidence on the record considered as a whole. Universal Camera Corporation v. N. L. R. B., 340 U. S. 474, 71 S.Ct. 456, 95 L.Ed. 456."

tion, within the meaning of section 8(3) of the act. The great majority of the employees, who were members of the union, continued to work; the company continued to recognize the union as the bargaining representative of its employees; the discharge and refusal to employ did not affect and could not have affected the status of the union as bargaining representative; and there is not a scintilla of evidence to support the conclusion that the discharge of the 'wild cat strikers or the refusal to reemploy them encouraged or discouraged membership in any labor organization or was intended to have any such effect. Western Cartridge Co. v. N.L.R.B., 7 Cir., 139 F.2d 855."

In Plasti-Line, Inc. v. N.L.R.B., 6 Cir. 1960, 278 F.2d 482, the Sixth Circuit stated.

"With regard to the second holding of the Board, that of violation by petitioners of Section 8(a) (3) of the Act, there is not a scintilla of proof in the record in support thereof. This Court, in N.L.R.B. v. Adkins Transfer Co., 6 Cir., 1955, 226 F.2d 324, 327, set forth the criteria necessary to establish a violation of this section as follows:

" 'In order to establish an 8(a) (3) violation, there must be evidence that the employer's act encouraged or discouraged union membership. The section requires that the discrimination in regard to tenure of employment have both the purpose and effect of discouraging union membership, and to make out a case, it must appear that the employer has, by discrimination, encouraged or discouraged membership in a labor organization.'

4. See Footnote 2, Medo Photo Supply Corp., supra:
"That the Act 'carries the clear implication that employers shall not interfere' with the right of collective bargaining 'by bargaining with individuals or minority groups in their own behalf, after representatives have been picked by the

"As noted, the case at bar is barren of any such evidence. To the contrary, the undisputed facts reflect that the opposite is true. There was an election, a certification by the Board and a contract which, at the time this controversy arose, was being recognized. No one of the group of strikers testified that his union membership had anything to do with his being discharged. The Court is unable, in the light of this record, to sustain the Board's action on this phase of the case. Certainly, there is no evidence of any kind to support an inference of a Section 8(a) (3) violation. The petitioners' discharge and refusal to reinstate the strikers, in the circumstances of this case, could not, under any stretch of the imagination, be considered an unfair labor practice under the latter section of the Act. N.L.R.B. v. Draper Corp., supra."

The record in this case firmly convinces me that the actions of this minority group of strikers, perhaps taken with the same ultimate motive that the Union had, was by no means consistent with the policies and methods of the Union. The majority apparently hold that so long as the ultimate objective is the same, any minority activity is protected. Such a construction of the Act will surely result in unauthorized action by dissident individuals or groups when, in their opinion, the union is moving too slow. In our view, the Congress did not intend to approve such conduct,[4] but sought to condemn such a course of action in the hope of promoting "industrial peace."

I must, therefore, dissent.

Rehearing denied; GEWIN, Circuit Judge, dissenting.

majority to represent all,' was recognized by the reports of the Congressional committees recommending the adoption of the bill which became the National Labor Relations Act. Sen.Rep. No. 573, 74th Cong., 1st Sess., p. 13; H.Rep. No. 1147, 74th Cong., 1st Sess., p. 20."